**Harry Garcia EDWARDS and his wife Mireya Garcia Edwards, Joseph J. Corcoran and his wife Turkan Corcoran and United States Security Services Corporation, Plaintiffs,**

v.

**Gene Robles SOTOMAYOR, Ramon Orisini Zayas, Jose Maldonado Trinidad and Reinaldo Vazquez Ortega, Defendants.**

Civ. No. 79–1191CC.

United States District Court,
D. Puerto Rico.

Jan. 27, 1983.

Patrick Cavanaugh, and Gustavo Vázquez-Mares, Hato Rey, P.R., for plaintiffs.

Esteban J. Núñez-Hoyo, Federal Litigation Div., Dept. of Justice, Com. of Puerto Rico, San Juan, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is an action for declaratory and monetary relief based on an arrest, search, seizure, and subsequent criminal prosecution which plaintiffs claim violated their constitutional rights. Jurisdiction is premised on determination of the federal constitutional rights underlying the claim, 28 U.S.C. Sec. 1331, as enforced by the Civil Rights Act, 42 U.S.C. Secs. 1981, 1983, 1985, 1986 and 1988. Dismissal has been requested by defendants[1] on the ground that the action is time barred. The motions for and in opposition to dismissal, the accompanying memoranda and exhibits, the oral argument offered and the documentary evidence on record reveal the following:

On June 2, 1975 defendants Gene Robles Sotomayor (Robles), Ramón Orisini Zayas, José Maldonado Trinidad and Reinaldo Vázquez Ortega, without order or warrant, entered and searched the premises of plaintiff United States Security Services Corporation (Security) in San Juan, Puerto Rico. The last three defendants mentioned were at that time law enforcement agents of the Special Investigations Division, Department of Justice of Puerto Rico, while Robles was a former employee of Security. The warrantless search resulted in the seizure of fourteen .38 caliber handguns which were contained in a closed box inside a closet in one of the rooms. Orders of arrest were issued against plaintiffs Harry García Edwards (García) and Joseph Corcoran (Corcoran), president and vice-president of Security. Criminal charges contained in fourteen counts were filed against them on June 26, 1975 in the courts of Puerto Rico for violation of Article 7 of the Weapons Law, *P.R. Laws Ann.,* Tit. 25 Sec. 417 and on June 11, 1975 in this Court for violation of 18 U.S.C. Sec. 922(e). The federal charges against García were eventually dismissed,[2] but the Superior Court of Puerto Rico, San Juan Part, found both García and Corcoran guilty. They were sentenced on June 17, 1976 to a concurrent six month suspended sentence on each count and later filed an appeal in the Supreme Court of Puerto Rico which hinged on their previously rejected suppression argument. This argument was based on their version of the facts which are summarized as follows:[3]

Security was a corporation duly authorized by the Puerto Rico Police Department to provide private security services which sometimes required the use of armed guards. It had been hired by a government agency to provide fourteen armed guards. To this end, García and Corcoran placed an order for fourteen handguns with a company in the United States that usually supplied firearms to their parent corporation in Baltimore. Unfamiliar with the legal procedures involved to obtain authorization of entry of the guns, they visited Police Headquarters together with defendant Robles who at that time was an employee of Security and who would help translating since García and Corcoran spoke no Spanish. They met with Lieutenant Estéfano Vázquez who informed that they had to formally notify the Police Department in writing of the shipment. Following these

1. The defendants who have appeared in this action are only those who are or were employees of the Commonwealth of Puerto Rico. Defendant Gene Robles Sotomayor has not appeared and his default was entered by the Clerk on October 9, 1980. Any future reference to defendants in this opinion will be made with this caveat in mind.

2. Corcoran's federal criminal case was transferred to the federal district court in Maryland where he pleaded *nolo contendere* and was sentenced to six months on probation and fined five hundred dollars.

3. The Court is not determining the veracity of any of these facts.

instructions, they sent a letter to the technical division of the Hato Rey Police Headquarters indicating the serial numbers of the guns that were to be shipped to Puerto Rico and requesting guidance as to how to register them once the shipment arrived. Since the letter was never answered, they assumed all was in order and proceeded with the shipment. The guns were packed in a box labelled "auto parts" as was customarily done with firearm shipments in order to curtail the curiosity of potential gun thieves. When the shipment was being retrieved, they told the officers from the Puerto Rico Treasury Department that the box contained auto parts. The box was then taken to the premises of Security and placed in a closet where it remained until found by the police during the search. The police arrived at Security's offices based on a sworn statement made by Robles indicating that there were unregistered firearms on the premises. Robles who had previously resigned from Security due to differences with García and Corcoran decided to initiate criminal proceedings against them. The agents, allegedly acting in concert with Robles, arrived at Security and met with William A. Alcover, Personnel Director of the company. They told him that they had received confidential information as to illegal guns in Security's premises and asked permission to search the offices. Mr. Alcover consented to the search stating that as far as he knew there were no illegal weapons in the place. When the police agents found the box and requested permission to

open it, Alcover again consented. The guns were seized and criminal charges leading to plaintiffs' conviction were filed.

On September 19, 1977 the Supreme Court of Puerto Rico reversed the conviction and acquitted García and Corcoran holding that the Superior Court should have granted the motion to suppress since the search was conducted in violation of the Constitution of Puerto Rico.[4] This complaint followed almost a year later—September 13, 1978. An identical complaint filed simultaneously in the federal court for the District of Maryland was later transferred to this District for lack of venue and consolidated with this action. The pleadings essentially state the same factual setting supporting the argument for suppression raised in the state criminal proceedings which has been outlined. Plaintiffs have added a conspiracy claim between Robles and the law enforcement agents based on their agreement to conduct the search, seize the weapons and to institute criminal proceedings against them[5] as well as a damage claim. The complaint is framed as a civil rights action seeking redress under 42 U.S.C., Secs. 1981, 1983, 1985, 1986 and 1988. The constitutional rights allegedly violated stem from the Due Process and Equal Protection Clauses and the Fourth Amendment of the United States Constitution.

Defendants urge that the civil rights claim is based on the illegal search and seizure and that, since federal law deter-

---

**4.** As translated by plaintiffs the judgment of the Supreme Court reads:

The record having been examined and the parties having been heard, we find that the trial court erred upon denying appellant's motion on unreasonable search and for the suppression of evidence. *People v. Barrios,* 72 PRR 163 (1951); *People v. Bonilla,* 78 PRR 144, 149 N. 2 (1955). In view of the violation of Sec. 10, Art. II of the Constitution of the Commonwealth of Puerto Rico, the judgment appealed from will be reversed and appellants will be acquitted.

It was so decreed by the Court and certified by the Chief Clerk. Mr. Justice Rigau took no part in this decision. (signed) Ernesto L. Chiesa, Chief Clerk.

**5.** The complaint on paragraph 8 alleges:

On or about June 5, 1975, defendants José A. Maldonado Trinidad, Ramón Orisini Zayas and Reinaldo Vázquez Otero working as police officers for the Commonwealth of Puerto Rico, together with a former employee of plaintiffs named Gene Robles Sotomayor, maliciously conspired to cause the arrest and criminal prosecution of the individual plaintiffs. Pursuant to such conspiracy, these individual defendants jointly and severally without a search warrant required by the Constitution and the laws of the Commonwealth of Puerto Rico and the United States of America and without probable cause to believe the commission of any crime, caused charges to be brought against the individual plaintiffs.

mines when an action based on a federal right accrues, this action accrued when the search and subsequent seizure took place for since then plaintiffs could note and charge the violation of their federal rights. Since the most analogous state statute of limitations is one year, they argue that the constitutional claim should have been brought on or before June 1976. Plaintiffs characterize their civil rights action as one analogous to a local tort action for illegal entry and search. Under this theory and according to local law,[6] this type of action does not accrue until the criminal proceedings have concluded and the search has been determined to be illegal. Since the criminal proceedings in this case ended with the Supreme Court's reversal on September 19, 1978, they contend that they had one year after this decision to file their action.

The parties puzzling limitation of the claim as one for illegal arrest and search requires that we examine the allegations to define the elements of the constitutional claims in issue. This complaint is essentially a claim of redress of damages caused by an allegedly wrongful use of the state's prosecutorial machinery by state officials and by a private party to deprive plaintiffs of their federal constitutional rights. Scrutinizing the complaint in search of local actions analogous to the constitutional claim reveals that the pleadings encompass not only the local torts of illegal search and arrest but also an action akin to that of malicious prosecution. Although the Commonwealth defendants deny the presence of a malicious prosecution claim, they have failed to substantiate this bare denial in a way which would justify disregarding the veracity of plaintiffs' pleadings at this stage of the proceedings. See: *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Regardless of which analogous local tort may be used to baptize plaintiffs' constitutional claims, federal law requires that we carve its epitaph under the statute of limitations.

The time period during which a civil rights action must be brought is determined by the forum's state statute of limitations for the most analogous type of action. *Board of Regents, etc., v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). In Puerto Rico, this court and our circuit have held that the applicable statute of limitations for these types of actions is the one year period provided by *P.R.Laws Ann.,* Tit. 31 Sec. 5298(2) for bringing *ex delicto* actions under *P.R.Laws Ann.,* Tit. 31 Sec. 5141. *Fernández v. Chardón,* 681 F.2d 42, 48 (1st Cir.1982); *Ramírez de Arellano v. Alvarez de Choudens,* 575 F.2d 315 (1st Cir.1978); *Graffals González v. García Santiago,* 550 F.2d 687, 688 (1st Cir.1977). See also: *Olmo v. Young and Rubican of Puerto Rico, Inc.,* —— PRR ——, decided on March 10, 1981, 81 JTS 22. In *Board of Regents, etc., v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) the Supreme Court indicated that in civil rights cases federal courts must also look to the laws of

**6.** In support of this contention they cite the decision of *Martí v. Hernández,* 57 PRR 804 (1940) which held that a party seeking redress for a wrongful attachment must demonstrate that the action where the attachment was issued terminated with a final judgment in his favor. However, although this is still the general doctrine in Puerto Rico, *Frigorífico M.H. Ortiz v. Quiles,* 101 PRR 928, 941 (1973); see also: *W. Clay Jackson Enterprises v. Greyhound Leasing,* 463 F.Supp. 666 (DPR 1979), there are situations where the Supreme Court of Puerto Rico has permitted, in view of exceptional circumstances, an action for damages due to abuse of attachment proceedings even though the action where these were granted did not end favorably to plaintiff. *Alum Torres v. Campos del Toro,* 89 PRR 299 (1963). The Court has also recognized that although the requirement of a final judgment setting aside the attachment is an indispensable substantive element of the cause of action, it is possible in procedural terms, and for the purpose of judicial economy to file a counterclaim for wrongful attachment as a contingent claim dependent on the outcome of the principal action. *Roldan v. Fernández Franco,* 105 PRR 424 (1976). Nevertheless, the exceptional circumstances possibility of *Alum Torres, ante,* is still alive for the Court recently indicated that the type of judgment that is eventually obtained in the action where the attachment was granted is not the only way of determining the illegality of the attachment for this determination can also be made from the action for damages itself. *Ortiz v. Chase,* 109 PRR 395, 397 (1980) (*per curiam*).

the state where they are sitting to determine the applicable tolling provisions and apply them, if not inconsistent with the federal policy underlying the cause of action under consideration. In the present case, none of the parties dispute these principles. The difficulty arises with the question of when plaintiffs' constitutional claims accrued. Since these claims are based on federal law, we must examine federal law for the accrual of a federal cause of action is determined by federal law. *Singleton v. City of N.Y.,* 632 F.2d 185, 191 (2nd Cir.1980), *cert: denied* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Rubin v. O'Koren,* 621 F.2d 114, 116 (5th Cir.1980); *Holmes v. Bateson,* 583 F.2d 542 (1st Cir.1978); *Walden III, Inc. v. State of R.I.,* 576 F.2d 945 (1st Cir.1978); *Bireline v. Seagondollar,* 567 F.2d 260 (4th Cir.1977).

█ A civil rights action is said to accrue when a plaintiff knows or has reason to know of the injury which is the basis of the action, *Rubin v. O'Koren, ante,* at 116, or when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situated. *Doyle v. Univ. of Alabama at Birmingham,* 680 F.2d 1323, 1325 (11th Cir.1982). However, what appears to be a clear doctrine has been applied with such variation, and at times with such incongruity, that its meaning is in dire need of clarification if it is to serve an area of law which already contains too many ravines. This meandering course is seen in the following cases. In *Lavellee v. Listi,* 611 F.2d 1129 (5th Cir.1980) the court distinguished three separate claims arising from plaintiff's complaint for civil rights violation. These were: assault and battery in being forced by the local police to submit to a spinal tap, failure to provide medical attention when requested and a malpractice action for negligent performance of the spinal tap. A different accrual standard was applied to each of these claims. The court reasoned that the malpractice claim could not have accrued until plaintiff realized the permanence of his injury and its relationship with the wrongdoing of the police. Applying its interpretation of the Supreme Court's accrual stan-

dard for a malpractice action under the Federal Tort Claims Act in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), it said:

> [T]he Supreme Court distinguishes between plaintiff's knowledge of the 'factual predicate for a malpractice claim,' i.e. 'the fact of his injury [and] its cause,' and awareness that a legal wrong has been done. See id., [444] U.S. at [121], 100 S.Ct. at 359 & N. 8. By making this distinction, the Supreme Court has rejected the standard which would allow the statute of limitations to commence running before the plaintiff was or should have been aware of the causal connection between his injury and the acts of defendants. Until plaintiff is in possession of the 'critical facts that he has been hurt and who has inflicted the injury,' id., the statute of limitations does not commence to run.

*Lavellee v. Listi, ante,* at 1131.

The case was remanded for further proceedings to determine whether plaintiffs were aware of the connection with the origin of the injury. The claim for assault was found to be time barred on the basis that the claim accrued when the spinal tap was performed. Yet the claim for refusal to provide medical attention was classified as a "continuing tort" and, under the rationale outlined in *Donaldson v. O'Connor,* see note *infra,* it was determined that the claim did not accrue until the date on which medical attention was in fact provided. A similar approach based on the continuing tort theory was suggested by Judge Weinstein in his dissenting opinion in *Singleton v. City of N.Y., ante,* where he indicated that by isolating the injuries alleged in the complaint, the court, although able to better identify the rights that had been infringed, was creating confusion and inconsistency by fractionalizing the civil rights claims into several state tort causes of action:

> Inconsistency and confusion result if accrual for purposes of a federal civil rights claim is ascertained by dividing the course of conduct complained of into sep-

arate causes in wooden reliance on state tort law concepts. The notion of a continuing tort is an integral part of federal law, *Gordon v. City of Warren,* 579 F.2d 386 (6th Cir.1978); *Briley v. State of California,* 564 F.2d 849 (9th Cir.1977). In light of the total transaction present here the remedial and deterrent purposes of section 1983 are furthered by providing plaintiff with a reasonable opportunity to become aware of his injuries and his rights and to pursue his federal claims. . . .

He also suggested that these interrelated actions (arrest, search, indictment, prosecution and conviction) should be construed as a "total transaction" and accrual should be determined by the last of these acts.

Other courts have recognized that there may be injuries which by their own special nature may not be discovered by the injured party until well after the originating act has occurred, i.e., *Briley v. State of California,* 564 F.2d 849, 855 (9th Cir.1977) (cause of action accrued when plaintiff discovered fraudulent concealment of plea bargaining conditions related to side effects of castration); *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir.1978) (fraudulent concealment tolled statute of limitation in case under section 10(b) of the Securities Exchange Act). Some courts have approached the problem by looking to state tolling provisions that may apply to the situation. I.e. *Kaiser v. Cahn,* 510 F.2d 282, 285 (2nd Cir. 1974) (claim was tolled during imprisonment construing New York laws to that effect).[7]

Although these varied approaches to the determination of accrual are useful and necessary in dealing with the multiple situations in which the issue arises, their application at times departs from the general principle that accrual is determined by federal law thus producing inconsistent results that may affect other aspects of substantive federal law. This inconsistency is ap-

parent in the approach to the question of when a civil rights action based on claims similar to a tort of malicious prosecution accrues. In *Singleton v. City of N.Y., ante,* the Court applied the reiterated principle that in civil rights cases the courts must look to federal law to determine accrual of the claim and concluded that since federal law dictated that the claim accrued when plaintiff became aware of the injury, the claim for assault and false arrest accrued on the very same day he was assaulted and arrested by New York police officers. However, this analysis was not extended to that part of the constitutional claim that resembled the state tort of malicious prosecution. Applying state law to this part of the claim, the court concluded that it did not accrue until the criminal proceedings had ended. Nonetheless, since the *state* tort action for malicious prosecution required that proceedings terminate in favor of the accused, the Court found that the voluntary dismissal of the criminal charges by the State of New York did not constitute a favorable termination of the criminal proceedings, as required by the state tort, and dismissed the analogous federal civil rights claim. It appears then that the Court's determination that accrual of a civil rights action similar to a state tort action for malicious prosecution exists only when the criminal proceeding has ended was based on the requirement, present in most state actions for malicious prosecution, that the criminal prosecution end in plaintiffs' favor. Other federal courts have also departed from the general rule that accrual of federal claims is determined by federal law when confronted with federal civil rights actions based on claims that can be classified as analogous to the tort of malicious prosecution. See: *Clive v. Brusett,* 661 F.2d 108, 110–111 (9th Cir.1981); *Jennings v. Shuman,* 567 F.2d 1213, 1216 (3rd Cir.1977); *Morrison v. Jones,* 551 F.2d 939, 940–941 (4th Cir.1977); *Cramer v. Crutchfield,* 496

---

**7.** Some courts have held that when a person is illegally arrested the time he spends in prison interrupts the limitations period. See: *Donaldson v. O'Connor,* 493 F.2d 507, 529 (5th Cir. 1974). In view of *Board of Regents v. Toma-*

*nio, ante,* it is possible to conclude that the time spent incarcerated may toll the limitations period, if state law so provides. However, since such a situation is not present in our case, we need not examine this possibility.

F.Supp. 949, 952 (E.D.Va.1980), *aff'd.* in 648 F.2d 943 (4th Cir.1981). A novel approach was suggested in *Morris v. Hoag,* 495 F.Supp. 797 (W.D.Mich.1980) where the Court, confronted with a civil rights action based on an illegal arrest and conviction subsequently set aside due to the prosecution's withholding of evidence, determined that in view of federal policies of judicial economy and state-federal comity the action was tolled during the pendency of the criminal proceedings. The Court derived its tolling rule from its interpretation of federal policies underlying the Civil Rights Act and did not rely on any state tolling provisions.

On the other hand, some courts have held that a civil rights action which is analogous to a malicious prosecution action has its own unique set of elements which may or may not coincide with the requirements for the tort claim. See: *Strung v. Anderson,* 452 F.2d 632, 633 (9th Cir.1972); *Rinehart v. Locke,* 454 F.2d 313, 315 (7th Cir.1971). These courts have emphasized the importance of recognizing the subtle distinctions between the constitutional characteristics of a civil rights claim from the traditional requirements of common-law torts. See: *Smith v. Cremins,* 308 F.2d 187, 190 (9th Cir.1962); *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963).

Although our Circuit has not directly addressed the question of when a civil rights action based on a claim analogous to a tort of malicious prosecution accrues, it suggested in *Landrigan v. City of Warwick,* 628 F.2d 736 (1st Cir.1980) that acts which may contain the elements of this tort, as recognized by state law, or of similar torts such as abuse of process may also constitute independent constitutional deprivations which may give rise to a civil rights claim, *id.,* at 745. And in *Walden III, Inc. v. State of R.I.,* 576 F.2d 945 (1st Cir.1978), a civil rights claim based on an illegal search, seizure, arrest and prosecution, the Court affirmed the position taken by the District Court in ruling that the actions were time barred since the period of limitations countdown began at the time the events took place. It rejected the argument that the civil rights action accrued when the criminal proceedings concluded in plaintiffs' favor and warned against the danger in analogizing every aspect of the constitutional claims:

> Some analogies are in fact false, inasmuch as Sec. 1983 has been construed as not embracing every violation of a duty for which state tort law provides a remedy. See: *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Harper v. Cserr,* 544 F.2d 1121 (1st Cir.1976). Thus plaintiffs' attempt also to analogize their claim to the state law of malicious use of process, and thereby to claim the benefits of Rhode Island's rule that a cause of action for such a claim does not accrue until the allegedly abusive proceedings have come to an end, overlooks the fact that Sec. 1983 applies to the violation of federal rights, and that a claim under that statute accrues when the federal right has been violated. See: e.g. *Bireline v. Seagondollar,* 567 F.2d 260 (4th Cir.1977). The federal rights violations alleged in plaintiffs' complaint all took place in 1969, even though some of the damages alleged to have been the effect of these violations occurred later. *Id.,* at N. 5, p. 947.

See also: *Thorn v. N.Y. City Dept. of Social Services,* 523 F.Supp. 1193 (S.D.N.Y.1981); *Marrapese v. State of R.I.,* 500 F.Supp. 1207, 1223 (D.R.I.1980).

■ Recognizing the differences between the constitutional claims and the common-law torts that they might resemble also appears to be more consonant with the view of the Supreme Court that the Civil Rights Act should not be a "font of tort law" substituting the traditional remedies provided by the state's common-law doctrines for redress of personal injury. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). See also: *Carey v. Piphus,* 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978). Thus, although *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) *overruled in part by Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its

numerous progeny have encouraged federal courts to borrow concepts from the traditional doctrines of tort liability to help define the elements of the constitutional claim,[8] this grafting is not unlimited. Courts have consistently recognized that claims under the Civil Rights Act involve certain unique elements that may not be reconciled with some concepts peculiar to the law of torts.[9] The Supreme Court has expressed that reliance on common-law doctrines to define the contours of a civil rights action is improper when such borrowing would be in conflict with the goals of the Civil Rights Act. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

In sum, the view most consonant with this severance of the two types of actions and to a certain degree necessary to enforce the policies of the Civil Rights Act calls for an analysis, within the framework of constitutional law, of the facts asserted in the civil rights complaint to define the constitutional elements accordingly for purposes of accrual. Thus, accrual of an action based on a violation of federal constitutional rights is necessarily tied in to a determination of when the events leading to the federal claim culminated. Once the violation of a claimant's federal constitutional rights is apparent, the federal cause of action accrues and there is no need to adopt a state accrual standard immersed in state requirements for a tort of malicious prosecution. To hold that a civil rights action which may be analogized to a tort of malicious prosecution accrues only when criminal proceedings have concluded is to rule that the elements of the constitutional claim as well as its accrual depend on a particular state's configuration of the requirements of the tort of malicious prosecu-

tion. Although we sympathize with the considerations expressed by the District Court in *Morris v. Hoag,* 495 F.Supp. 797 (W.D.Mich.1980) on the impractical results of superfluous litigation and possible friction between state and federal courts if a civil rights action based on a claim analogous to a state tort of malicious prosecution or abuse of process is not held to accrue after the criminal proceedings have ended, we believe the other interests involved outweigh those of comity and judicial economy. To adopt a state's definition of accrual for its tort of malicious prosecution as an inherent element of a civil rights action based on wrongful institution of a state's criminal proceedings is to create a dangerous precedent that could foreclose access to a federal court to persons harassed by state criminal proceedings all throughout the period that these proceedings may last because their federal claim has not "accrued." We need not mention the many possibilities of wrongdoing in misusing state criminal proceedings for insidious purposes and how easily they may be delayed until suffocating the rights of an individual. This exceptional resort to state law for a definition of accrual of a civil rights action that may be analogized as a tort of malicious prosecution may also create an inconsistent application of substantive federal law for, depending on how the tort has been defined by state law, the constitutional civil rights claim may exist or not. For example, in *Singleton v. New York, ante,* the Court in considering part of the civil rights claim as similar to the tort of malicious prosecution determined that the state law on this tort required a favorable conclusion of the criminal proceeding. It determined that the dismissal of the charges was not a "favor-

---

**8.** See i.e.: *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1980) (civil rights action may be based on negligent state action); *Butz v. Economou,* 438 U.S. 478, 500–501, 98 S.Ct. 2894, 2907–08, 57 L.Ed.2d 895 (1978) (use of the common-law defense of good faith); *Allen v. Dorsey,* 463 F.Supp. 44 (E.D.Pa.1978) (defense of qualified immunity). See also: *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and Whitman, *Constitutional Torts,* 79 Mich.L.Rev. 1, 14–21 (1980).

**9.** See i.e.: *Monell v. Department of Social Services,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (respondeat superior liability held not applicable to Sec. 1983 actions); *Howell v. Cataldi,* 464 F.2d 272, 278 (3rd Cir. 1972) (*Monroe v. Pape* did not hold that the rights protected by the Civil Rights Act must be conceptualized as tracking exclusively the footprints of tort law).

able conclusion as required by state law" and dismissed the federal claims. In Puerto Rico, the Supreme Court although recognizing that a tort based on malicious prosecution requires a favorable conclusion to the accused has not ruled on what is meant by a "favorable conclusion" of the proceedings. See: *Pares .v. Ruiz,* 19 PRR 323 (1913). Furthermore, since Puerto Rico derives its personal injury actions from a statute and the general principles of Spanish Civil Law, see: *Valle v. Amer. Inter. Ins. Co.,* 108 PRR ——, 108 DPR 692 (1979), analogizing with local tort law may sometimes produce different results than those arrived at in common-law jurisdictions. For example, the tort of abuse of process generally defined by common-law doctrine as the use of a legal process to accomplish an end not within the intended scope of the process, *Grainger v. Hill,* 4 Bing. (N.C.) 211, 132 Eng.Rep. 769 (1838), see also: *Weiss v. Hunna,* 312 F.2d 711 (2nd Cir.1963), does not exist as such in Puerto Rico. *Compare: Pereira v. Hernández,* 83 PRR 156 (1961) with *Berrios v. International General Electric,* 88 PRR 106 (1963) and *Fonseca v. Oyola,* 77 PRR 496 (1954). See: note 8, *infra.* There are many ways in which criminal proceedings may conclude that may be considered "favorable" to an accused depending on the state's interpretation of this requirement if, in effect, the requirement exists in a particular jurisdiction. There are also multiple state procedures, civil, administrative or criminal, which may be used in manners offensive to the Federal Constitution without precisely meeting all the common-law requirements of a tort of malicious prosecution. To infuse a civil rights claim similar to a tort of malicious prosecution with the particular state requirements for the elements of that tort would promote an unequal protection of federal constitutional rights. Enforcement of federal con-

stitutional rights would depend on which state the district court were found. Important federal policies of uniformity in constitutional matters might be affected by such a haphazardous approach. See: *Robertson v. Wegman,* 436 U.S. 584, 593, 98 S.Ct. 1991, 1996, 56 L.Ed.2d 554 (1978). Also, one of the principal policies of the Civil Rights Act, deterrence of unconstitutional action by state governments, see: *id.,* might be seriously jeopardized if the accrual of a civil rights claim similar to the present one were found to depend on the state's determination of accrual for its analogous tort. There is only one Federal Constitution which must be interpreted, protected and enforced in like manner whether the federal court sits in Fairbanks, Alaska or in San Juan, Puerto Rico. Although the considerations of comity, federalism and judicial economy taken into account in *Morris v. Hoag, ante,* are definitely valid ones, they are best dealt with by the doctrines of abstention which are left to the federal court's discretion and which are not absolute mandates of nonintervention.

We conclude that, although the time limitation period is determined by the one provided by state law for the most analogous claim, once that period has been adopted, the borrowing stops and the moment of accrual of the action is determined by federal law. The courts having determined that the period of limitations to be adopted from Puerto Rico is the one year provided for *ex delicto* personal injury actions established by *P.R.Laws Ann.,* Tit. 31 Sec. 5298(2), our sole duty is to ascertain the federal constitutional claim as contained in the pleadings, determine by federal standards the point in time in which they accrued and then conclude if they were filed during the time period provided [10] or whether this period has been tolled.

---

**10.** Our approach of examining the pleadings and isolating the events that gave rise to the constitutional claim does not have to be inconsistent with our Circuit's suggestion in Walden III, *ante,* that one statute of limitation for a complaint is preferable nor with the concern expressed by Judge Weinstein in his dissenting opinion in *Singleton v. N.Y., ante.* In the present case the federal civil rights claims are clearly ones similar to actions for redress of personal injury. A civil rights claim has traditionally been said to state a cause of action lying in tort. *Graffals González v. García Santiago,* 550 F.2d 687, 688 (1st Cir.1977). In Puerto Rico *ex delicto* actions similar to the instant one have only one statutory period of

A review of plaintiffs' allegations reveals the presence of possibly six unconstitutional acts, all occurring during the months of June and July 1975. These can be summarized as: the search of Security, the seizure of the handguns, the arrest of García and Corcoran, the filing of the charges, the news release and the alleged conspiracy to perform these acts. We find that all of these acts accrued at the same time they occurred or shortly thereafter since all the elements of the alleged unconstitutionality of these acts were clearly apparent to plaintiffs when the events took place. It is at this point in time that the invasion of plaintiffs' constitutional rights became apparent. Plaintiffs have not alleged that certain key information that would have enabled them to discover the illegality of the acts was withheld or that it surfaced later during the proceedings. *Cf. Hilliard v. Williams,* 516 F.2d 1344 (6th Cir. 1975) (prosecution deliberately withheld results of blood test which favored the accused). They have also failed to allege that after the criminal charges were filed the prosecutor voluntarily joined the conspiracy in a deliberate attempt to deny them their due process rights. In short, there is nothing in the complaint, even on a liberal reading as required at this stage, to suggest that other unconstitutional acts followed the ones mentioned, all of which occurred during June-July 1975. As to the conspiracy count, it has been held that these type of actions accrue when the last overt act alleged to have caused the damage is performed. *Kadar Corp. v. Milbury,* 549 F.2d 230, 234 (1st Cir.1977). In this case, the last overt acts alleged were all during the period of June-July 1975 when the search and arrest occurred and the indictment was brought. Fixing accrual at this time would, therefore, lead to the conclusion that the conspiracy claim is also time barred.

The only possibility for plaintiffs' federal constitutional claims to survive the statute of limitations is if their actions tolled the statute of limitations in a manner recognized by state law, if not inconsistent with federal policies or federal law, or, if necessary to protect some important federal interest. Prescription of actions in Puerto Rico is interrupted by "their institution before the courts, by extrajudicial claim of the creditor and by any act of acknowledgement of the debt by the debtor." *P.R.Laws Ann.,* Tit. 31 Sec. 5303. This Court and our Circuit have previously ruled that the phrase "their institution before the courts" means that the action instituted must have been identical to the action later filed in order to interrupt the time period. See: *Ramírez de Arellano v. Alvarez de Choudens,* 575 F.2d 315, 319 (1st Cir.1978). This would rule out any possible local tolling provision by the pending criminal proceeding. Resort to federal law for a tolling doctrine is uncalled for, given the lack of any overriding federal interests and the decision in *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). Plaintiffs have not come forward with support for such tolling theory either. There being no reason to conclude that the statute of limitations was tolled, we find that the federal civil rights claims should have been instituted on or before July 1976 that these claims are time barred and are, accordingly, DISMISSED.

SO ORDERED.

limitations, regardless of how the tort is designated.    nated.