609 F.Supp. 1332 (1985)
Dean RAYMER, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. S82-138C (D).
United States District Court, E.D. Missouri, Southeastern Division.
February 11, 1985.
*1333 Robert J. Albair, Clayton, Mo., for plaintiff.
Jill S. Newman, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision following a trial on the merits. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court hereby makes the following Findings of Fact and Conclusions of Law. Any Finding of Fact equally applicable as a Conclusion of Law is adopted as such and, conversely, any Conclusion of Law equally applicable as a Finding of Fact is adopted as such.

FINDINGS OF FACT
1. Plaintiff Dean Raymer is a resident of Missouri. He is forty (40) years old.
2. On July 18, 1979, Raymer was injured in a motor vehicle accident in Carter County, Missouri. The accident occurred when plaintiff turned his van onto Highway 103 and collided with another vehicle. Plaintiff's van was thrown into a depressed area near the side of the road by the force of the collision.
3. Both plaintiff and his passenger, one Joan Barker, were injured in the collision.
4. Plaintiff was unable to move from the van by himself. Consequently, another individual at the scene pulled plaintiff from the van and dragged him to the top of the depression to await the arrival of an ambulance. Plaintiff was approximately four (4) feet from the edge of the depression at this time.
5. Plaintiff was incoherent and semiconscious. However, he was still mobile and moving. He was described by witnesses as "thrashing about", "rolling" from side to side, and as having some movement and use of all four extremeties including his hips and mid-torso. As a result of this state, he moved around to such an extent that he rolled down the side of the depression and had to be dragged or carried back up.
6. An ambulance from the West Carter County Ambulance Service arrived and plaintiff was placed on a stretcher and put in the ambulance along with Barker. Plaintiff was uncooperative, talking loudly, and thrashing around. Although plaintiff did not move his lower extremeties, he was moving his arms, shoulders, and upper body.
*1334 7. The Emergency Medical Technicians in the ambulance placed a cervical collar around plaintiff's neck and strapped him to the stretcher. Plaintiff removed the collar, however, and worked loose of the straps. He then rolled off the stretcher and onto the ambulance floor. The technicians stopped the ambulance and placed plaintiff back on the stretcher.
8. The ambulance took plaintiff first to Doctor's Hospital in Poplar Bluff. He had remained incoherent and abusive during the trip. While at Doctor's Hospital plaintiff was interviewed by the admitting nurse who reported no signs of paralysis. Moreover, he was observed by at least one witness as moving his leg. Further testimony indicated that he still retained some movement in his extremeties.
9. Plaintiff requested that he be moved to the Veteran's Administration Hospital in Poplar Bluff. Pursuant to this request, he was admitted to the Veteran's Administration Hospital at approximately 9:30 P.M. The ambulance attendants told the admitting nurse, one Joyce Duncan, that plaintiff had been in a "1050". A "1050" is emergency personnel code which means an automobile wreck.
10. The Veteran's Administration Hospital in Poplar Bluff is a one hundred seventy six (176) bed facility which contains three medical floors, a surgical floor and an Intensive Care Unit. It is equipped with an FTS communication system allowing it to contact other Veteran's Administration hospitals in the country, including the St. Louis Veteran's Administration Hospital.
11. The Court finds by a preponderance of the evidence that the plaintiff retained some movement in his lower extremities when he presented at the Veteran's Administration Hospital. Plaintiff was still incoherent and thrashing about at the time he was presented at the Veteran's Administration emergency room. One of the ambulance attendants noted that he still appeared able to move one leg. The testimony is consistent from shortly after the accident until presentment at the Veteran's Administration Hospital that plaintiff's condition remained the same. He is described by various witnesses as rolling from side to side, thrashing about, and having movement in his torso and at least the upper portion of his legs.
12. The physicians, surgeons, and medical staff who examined and treated plaintiff at the Poplar Bluff Veteran's Administration Hospital held themselves out to be competent physicians, surgeons, and medical personnel and able to treat their patients with proper and skillful medical care, including the treatment of spinal injuries. The physicians, surgeons, and medical staff at the Poplar Bluff Veteran's Administration Hospital were servants, agents, and employees of the defendant United States of America, and they were acting under color of their office and within the scope and course of their employment as physicians, surgeons, and medical personnel employed by the United States of America at all times pertinent to this cause.
13. Plaintiff's attending physician in the emergency room was Dr. Leary. His initial diagnosis was that plaintiff was suffering from either a head injury or that he was inebriated. Dr. Leary did not notice any movement of the lower extremities but he noted full movement of the upper extremities. He noted no response to painful stimuli anywhere. He ordered x-rays of plaintiff's skull, chest, lumbar spine, and pelvis. These were all negative. He failed to order a cervical x-ray. Plaintiff was admitted to the intensive care unit at 11:30 P.M.
14. Plaintiff's cousin, one Steve Raymer, testified that he observed plaintiff doing a partial sit-up, without significant use of his hands, while on the examination table. Moreover, plaintiff was allowed to sit up, roll over, and turn his head and neck during his time at the Veteran's Administration Hospital.
15. Plaintiff's brothers, Don and Dale Raymer, observed that plaintiff's entire body, including his hips and legs were flopping and rolling around after plaintiff had been admitted to intensive care. During that night one of plaintiff's attending nurses *1335 noted that he had sensation beginning in his upper thighs and rising above that level.
16. Plaintiff stayed on a mattress in the Intensive Care Unit from 11:10 P.M. on July 18 to sometime after 9:00 A.M. on the 19th when Dr. Graziani ordered cervical x-rays. During that time he was never immobilized with sandbags, traction or a cervical collar, all of which are available at the Veteran's Administration Hospital.
17. Dr. Graziani performed a physical examination, ordered x-rays, and determined at approximately 10:00 A.M. on July 19, 1979, that there had been an injury to the C-6 and C-7 level of the spine. Dr. Graziani then contacted a neurosurgeon in St. Louis who advised immediate immobilization with a cervical collar, spineboard, and sandbags. The cervical collar was applied by a Dr. Chung at 1:30 P.M. on July 19, 1979. At 3:00 P.M. on the same day plaintiff was stabilized with sandbags, placed on a spineboard, and transferred to the St. Louis Veteran's Administration facility.
18. Plaintiff arrived at the St. Louis Veteran's Administration Hospital at 5:30 P.M. on July 19. He was treated there until September 6, 1979 when he was transferred to the Veteran's Administration Spinal Cord Unit at Jefferson Barracks, Missouri. He remained at this facility until December 21, 1979.
19. Plaintiff's current condition is complete sensory loss at the T-1 Dermatone level, i.e. paralysis from the mid-chest region downward. Consequently, plaintiff has lost full use of and sensation in his hands, arms, stomach, hips, and buttocks. This paralysis has caused a concomitant loss of bowel and bladder control, as well as sexual function. The Court finds that this physical and functional damage described above is a direct and proximate result of defendant's negligence. The Court also finds, however, that plaintiff's original paralysis, which started at the mid-thigh level and extended downward, was a result of the accident or events subsequent to the accident but prior to his presentment at the Poplar Bluff Veteran's Administration Hospital.
20. Plaintiff's age was 35 years old at the time time of his injury. He had a life expectancy at that time of 37.8 years. He had completed one semester of Junior College in Agri-Business and planned to complete the two year course at the time of the accident.
21. There is substantial medical testimony that plaintiff's current condition renders him permanently unemployable and unable to continue his schooling and education. There was also testimony to suggest that this would not have been the case if plaintiff had remained a simple paraplegic. In that event, the evidence indicates, and this Court finds, that he would have been reasonably employable, within certain limits, and that he would have reasonably been expected to continue his schooling.
22. Presently, plaintiff requires the services of a full-time nurse and will require some type of medical care for the remainder of his life. Plaintiff has chronic problems with physical therapy, infections, bowel and bladder problems, and ingestion of medications. He also experiences problems with the daily activities of life such as hygiene, shaving, bathing, and transportation. Many of these problems would not exist if plaintiff had remained a paraplegic as opposed to a semi-quadraplegic. Hence, the Court finds that defendant is responsible for a major portion of plaintiff's fulltime nursing expenses.
23. Plaintiff remembers nothing of the accident or his stay at the Veteran's Administration Hospital due to heavy medication and the trauma of the accident. His first point of continuous recollection begins after his admission to the Veteran's Administration Hospital in St. Louis several weeks later.
24. On September 12, 1979, plaintiff signed a retainer agreement with an attorney, one Arnold Phillips, to proceed against the West Carter County Ambulance Service, the driver of the ambulance, and Doctor's Hospital.
*1336 25. Plaintiff's attorney immediately attempted to obtain plaintiff's hospital records from the Veteran's Administration. To that end, plaintiff's medical authorization release forms were forwarded to the Veteran's Administration on September 12, 1979 and again on October 10, 1979. In response to this second request, Phillips received a five page discharge summary from the St. Louis Veteran's Administration Hospital dated January 4, 1980. On September 29, 1980, the Veteran's Administration sent plaintiff copies of the Memphis Veteran's Administration Hospital records. It was not until May 14, 1981, after repeated inquiries, that portions of the Poplar Bluff Veteran's Administration Hospital records were sent to plaintiff. The remainder of the records were sent to plaintiff on June 17, 1981 after yet another request.
26. On June 24, 1981, plaintiff sent a letter to Dr. Marshall Conrad and Dr. Charles Aprahamion, plaintiff's expert witnesses. This letter contained the completed Veteran's Administration Hospital records. Dr. Conrad sent a letter on June 29, 1981 which indicated that there had been medical negligence on the part of the Poplar Bluff Veteran's Administration Hospital personnel. This Court finds that this was the first time plaintiff had been made aware of possible negligence by the Poplar Bluff Veteran's Administration Hospital despite his diligent effort to discover such negligence at an earlier date.
27. On July 17, 1981, plaintiff filed an amended petition in the Circuit Court of Carter County, Missouri naming Doctor's Hospital of Poplar Bluff; the Veteran's Administration Hospital of Poplar Bluff, and several individual doctors as additional defendants. The United States filed a Petition for Removal and the case was removed to the United States District Court for the Eastern District of Missouri. The defendant then filed a motion to dismiss on the grounds that plaintiff had failed to file an administrative claim with the Veteran's Administration prior to filing his amended petition. The motion to dismiss was granted because the filing of the administrative claim is a jurisdictional prerequisite to pursuit of a judicial remedy.
28. On September 11, 1981, plaintiff filed his administrative tort claim with the Veteran's Administration. The Veteran's Administration denied plaintiff's administrative tort claim, determining that plaintiff's claim was barred by the statute of limitations. Plaintiff then proceeded with the current action.

CONCLUSION OF LAW
This Court's jurisdiction is invoked pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The resolution of this cause focuses on three issues: (1) whether defendant, United States of America, through its agent the Veteran's Administration Hospital of Poplar Bluff, was negligent in its treatment of plaintiff's injuries; (2) whether defendant's negligence, if any, caused plaintiff any additional injury beyond what he would have suffered from the original accident along with the subsequent actions of intervening parties prior to his admission to the Veteran's Administration Hospital; and (3) whether defendant may effectively raise the affirmative defense of the statute of limitations.

DEFENDANT'S NEGLIGENCE
After reviewing defendant's actions following plaintiff's admission and juxtaposing those actions with accepted medical practices, this Court concludes that defendant failed to exercise those practices.
Accepted medical practice dictates that an individual who has been in an automobile accident and who presents with head injuries and lacerations should be considered a candidate for spinal cord injury. As the actions of defendant subsequent to plaintiff's admission reveal, this practice was not followed. Proper emergency room procedure indicates that a patient with a suspected spinal cord injury be moved and allowed to move as little as possible. To this end, the patient's head and neck should be immobilized with the use of sandbags, a cervical collar, and a spineboard. The use of such items on an individual who did not *1337 have a spinal cord injury would not be harmful. In plaintiff's case, his neck was not stabilized with a cervical collar until sixteen (16) hours after his admission; his neck was not stabilized with sandbags until seventeen (17) hours after admission; and he was not totally immobilized until his transport to St. Louis seventeen and one-half (17½) hours after admission. The culpability of the Veteran's Administration's delay is exacerbated by the fact that Dr. Graziani had contacted Dr. Rich, a neurosurgeon at the Veteran's Administration Hospital in St. Louis, who advised immediate immobilization. This call was made several hours before plaintiff was in fact immobilized.
Furthermore, proper procedure dictates that if a patient is restless and combative, as was clearly the case upon plaintiff's admission, he should be physically or chemically restrained with straps or sedatives. Plaintiff was not so immobilized until shortly before his transport to the St. Louis Veteran's Administration Hospital. As a result of this delay, plaintiff was allowed to sit up and roll around the entire night and into the next morning during his stay at the Poplar Bluff Veteran's Administration Hospital. Proper emergency medical room procedure dictates that treatment of possible spinal cord damage includes the taking of cervical x-rays. Upon plaintiff's admission, Dr. Leary ordered x-rays only in the lumbar region. It was not until twelve (12) hours after admission that a cervical x-ray was taken and a complete physical examination was made, whereupon the spinal fracture was discovered.
This Court finds that it is beyond argument that defendant's actions in treating plaintiff were negligent.

PROXIMATE CAUSE
A more difficult issue to be resolved is whether the negligent treatment of the Veteran's Administration Hospital actually caused plaintiff further injury beyond that suffered prior to his admission. A brief review of the facts indicate that plaintiff was injured in an automobile accident and pulled from the wreckage; he was then dragged up a small embankment to the side of the road. Because of plaintiff's incoherent and delerious condition he rolled around to such an extent that he rolled down the embankment and had to be pulled up again to the side of the road. When the ambulance arrived, he was not placed on a spineboard, but a cervical collar was applied. Plaintiff tore the collar off, however, while he was in the ambulance and it was not placed back on him. Additionally, he moved around to such an extent that he fell off the stretcher while in the ambulance.
It is defendant's contention that if plaintiff was not paralyzed by the accident, his subsequent actions and treatment was the causative factor of his paralysis. Thus, any negligence on the part of the Veteran's Administration personnel was not the proximate cause of plaintiff's injuries.
This Court disagrees. Plaintiff's current condition is paralysis from the middle of his chest downward. Yet, after his accident, he was able to move his upper body and torso at least three to four feet to the edge of an embankment and over it. Moreover, after presentment to the Veteran's Administration Hospital in Poplar Bluff, he was observed by both of the ambulance attendants to move his leg, and his torso, thrashing from side to side. Furthermore, he was observed by his cousin Steve Raymer to do a partial sit-up on the examining table without using his hands to pull himself up. Finally, one of the Veteran's Administration's own personnel, Nurse Wiley, noted that plaintiff had sensation beginning in his upper thighs and rising above that level during the first few hours after his admission. By the next morning he had lost sensation and movement up to his mid-chest, which is his current condition. Plaintiff's expert witness, Dr. Charles Aprahamian, concluded that plaintiff's loss of mobility while at the Veteran's Administration Hospital indicated a progression of the disability. Moreover, he was of the opinion that the progression of *1338 the paralysis was caused by the personnel's actions and inactions.
From this evidence the Court concludes that the negligence of the Veteran's Administration's staff caused a progression in defendant's injury. The testimony is consistent that plaintiff's lower legs were paralyzed from the time of the accident. There is very little testimony that plaintiff was actually moving his lower legs at any time after his initial injury. There is, however, consistent and strong testimony indicating that plaintiff was moving his torso from side to side and moving the upper part of his legs for a significant period of time after his admission to the Poplar Bluff Veteran's Administration Hospital. The competent medical testimony is that plaintiff would have been unable to move in such a manner had he suffered a complete lesion of his spinal cord. Thus the negligence of the Veteran's Administration Hospital personnel transformed a case of semiparalysis into a case of semi-quadriplegia.

STATUTE OF LIMITATIONS
Defendant argues that plaintiff is barred from pursuing this cause because of the delay in filing this suit. As previously delineated in the Findings of Fact, there was a substantial delay between the time of the injury and the time that plaintiff filed this action with the appropriate court.
Title 28 U.S.C. § 2401(b) provides in pertinent part:
"A Tort Claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal Agency within two years after such claim accrues...."
As defendant points out, plaintiff's claim clearly accrued on July 18 or 19, 1979. Plaintiff filed his original petition in state court against the West Carter County Ambulance Service and its employees on December 13, 1979. The amended petition, which included the Poplar Bluff Veteran's Administration Hospital as a defendant, was filed on July 17, 1981. Plaintiff had failed, however, to file the administrative claim with the Veteran's Administration Office, and had therefore failed to present the claim "in writing to the appropriate federal agency within two years after ..." the accident. Plaintiff's Administrative Tort Claim was not filed until September 11, 1981 at which time the statute of limitations was tolled.
Defendant directs this Court's attention to the cases of Kington v. United States, 396 F.2d 9 (6th Cir.1968) and Garrett v. United States, 640 F.2d 24 (6th Cir.1981). These authorities point out that an action dismissed without prejudice leaves the situation the same as if the suit had never been brought. Kington, 366 F.2d at 10 quoting Boner v. Ribicaff, 304 F.2d 427, 428 (6th Cir.1962). Therefore, neither the filing of plaintiff's suit in state court nor its subsequent removal and dismissal from federal district court worked to toll the statute. Hence, defendant concludes that plaintiff's claim is time barred.
Plaintiff, of course, analyzes this issue differently. Plaintiff states that he was unable to remember anything until several months after the accident due to the trauma induced by the accident and the heavy medication that was administered to him. Moreover, plaintiff points out that he did not receive the complete medical records of his stay at the Poplar Bluff Veteran's Administration Hospital, despite repeated requests, until June 17, 1981. It was only then that plaintiff's expert witness, Dr. Conrad, could give plaintiff the first indication that malpractice had occurred during the approximately seventeen (17) hours that plaintiff remained in the Poplar Bluff Veteran's Administration Hospital. Therefore, plaintiff urges this Court to adopt the position that the meaning of the word "accrue" as it is used in the Federal Torts Claim Act should not be limited to the actual time of the negligent injury, but should extend to the factual predicate of his claim.
It should be noted first that the United States, as sovereign, is immune from suit absent its consent to be sued. See, e.g., United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Thus, *1339 Congress controls the conditions under which suits may be permitted. Kendall v. United States, 107 U.S. 123, 125, 2 S.Ct. 277, 27 L.Ed. 437 (1982).
However, when Congress has permitted suit, the courts have viewed the conditions imposed with an eye to providing the type of effective relief that Congress intended. Thus, in Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), a case dealing with the government's liability for plaintiff's degenerative lung disease, the Court states:
"[I]f we assume that Congress intended to include occupational diseases in the category of injuries compensable under the Federal Employer's Liability and Boiler Inspection Acts, such mechanical analysis of the `accrual' of petitioner's injury  whether breath by breath, or at one unrecorded moment in the progress of the disease  can only serve to thwart the congressional purpose.
If Urie were barred from prosecuting this action ... it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time ... Urie was charged with the knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate date of his discovery and disability.... We do not think the humane legislative plan intended such consequences to attach to blameless ignorance."
In following this criterion, to implement the intent of Congress in passing legislation such as the Federal Tort Claims Act, it has been held that a claim for medical malpractice against the United States accrues when the claimant discovers, or in the exercise of reasonable diligence should discover, the essential facts relating to: (1) the existence of his injury and (2) its probable cause. Kubrick v. United States, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259, (1979); Stoleson v. United States, 629 F.2d 1265 (7th Cir.1980).
In plaintiff's case, this process was rendered significantly more difficult because he had been in a severe automobile accident and had then been treated in what he apparently thought was a negligent manner by the personnel of the West Carter County Ambulance Service. Plaintiff may well have believed, and the Court finds that a reasonably diligent individual would have believed, that he had all of the causative elements of his paralysis at hand. Therefore, the delay in receiving the medical records from the Poplar Bluff Veteran's Administration Hospital was, in this particular instance, crucial in developing plaintiff's case. As has been noted, these records were not viewed until June of 1981 despite plaintiff's attempts to obtain them. Thus, the Court finds that it was not until this time that plaintiff could reasonably believe that malpractice on the part of the personnel in Poplar Bluff had occurred. Consequently, it was at this time that plaintiff's claim against this defendant accrued and plaintiff is not barred by the statute of limitations.

DAMAGES
The Court has found that defendant was negligent and that this negligence was the proximate cause of plaintiff's current state of semi-quadraplegia. The Court further has found that but for the negligence of the personnel of the Veteran's Administration Hospital in Poplar Bluff, plaintiff would have remained a paraplegic. Thus, defendant's actions and omissions resulted in damage to the spinal cord causing loss of full use and sensation in plaintiff's hands, arms, stomach, and hips. Along with the loss of control of these areas of the body, plaintiff has suffered loss of bowel and bladder control and loss of sexual function. It is for the physical and emotional damages of these injuries, as well as their future pecuniary costs, upon which this Court must base its judgment. The Court has not found defendant liable for plaintiff's *1340 paralysis at the mid-thigh level downward.
Plaintiff has submitted a loss of wages estimate between Four Hundred Sixty One Thousand Five Hundred Six Dollars ($461,506.00) and Six Hundred Forty Three Thousand Eight Hundred Ten Dollars ($643,810.00). The Court finds the lower of these two estimates to be the true measure of plaintiff's lost wages. Although plaintiff had completed his highschool "G.E.D." and a semester of college, the government is correct in pointing out that plaintiff's age and past employment record militate against a large award based on loss of earnings. The Court disagrees, however, with the government's assessment that plaintiff should receive no compensation. Defendant apparently bases this conclusion on the theory that, even were he healthy, plaintiff would not work again the rest of his life. The evidence indicates, however, that prior to his accident plaintiff appeared to have taken a greater interest in his professional life. On this basis it appears that there was a significant loss of earnings attributable to defendant's negligence.
With respect to nursing care, plaintiff indicates a range of cost between Eight Hundred Fifty Two Thousand Eight Hundred Sixty Two Dollars ($852,862.00) and Two Million Twenty Four Thousand Four Hundred Forty Six Dollars ($2,024,446.00). Again, the Court finds the lower figure to be more acceptable and sets a value of One Million Dollars ($1,000,000.00) in damages as compensation for future nursing care. This lower figure is applicable less because the Court believes that it will achieve full compensation for full-time nursing care and more because defendant cannot be held liable for all of plaintiff's nursing needs since plaintiff undoubtedly would have required some nursing care and rehabilitation because of his original paralytic injury.
The Court finds a sum of Six Hundred Thousand Dollars ($600,000.00) appropriate as damages for plaintiff's mental and physical injuries. This figure incorporates the fact that plaintiff would have been paralyzed from his original injury and compensates him for his quadraplegic condition.
In sum, plaintiff's total damages equal Two Million Sixty One Thousand Five Hundred Six Dollars ($2,061,506.00). Plaintiff's prior settlement with the West Carter County Ambulance Service of One Hundred Thousand Dollars ($100,000.00) must be subtracted from this sum leaving a total damage figure of One Million Nine Hundred Sixty One Thousand Five Hundred Six Dollars ($1,961,506.00) awarded to plaintiff.