**In the Matter of the CENTRAL RAILROAD COMPANY OF NEW JERSEY,**

**Wilmat Holdings, Inc., (as successor-in-interest to Central Jersey Industries, Inc.) ("Wilmat"), Appellant.**

**No. 91–5259.**

United States Court of Appeals, Third Circuit.

Argued Aug. 13, 1991.

Decided Dec. 10, 1991.

Stanley Weiss (argued), Carpenter, Bennett & Morrissey, Newark, N.J., for appellant.

Rodney B. Griffith, Margaret Woodruff (argued), Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee Consolidated Rail Corp.

Gregory J. Hannon, Stanley M. Shingles (argued), Brobyn & Forceno, Philadelphia, Pa., for appellees Joseph F. Kudlesky, Frank Parano, Paul E. Sakowski, James A.

Bristol, Glenn N. Carmitchel, Charles A. May, John J. Bilsak, George E. Davis, James C. Douglas, Edward J. Finney, William L. Focht, John A. Hosage, Joseph A. Maraski, Walter E. Marienschek, Andrew G. Michalow, Lamar N. Purnell, Louis F. Rauch, Richard C. Anglemeyer, George R. Searfoss, Neal L. Brown, Dale D. Vogel, Joseph F. Koetting.

Michael J. Dillon (argued), Krumholz, Horn, Schechtman & Hirsch, Jersey City, N.J., for appellee Joseph Benedetto.

James H. Savage, Ruprecht & Hart, Millburn, N.J., for appellee New Jersey Transit Rail Operations, Inc.

Before COWEN and NYGAARD, Circuit Judges, and POLLAK, District Judge.*

## OPINION OF THE COURT

LOUIS H. POLLAK, District Judge.

### Introductory Statement

In order properly to understand the problem now before this court, it may be helpful to take a brief retrospective look at events now well in the past.

On March 12, 1967—almost a quarter of a century ago—the Central Railroad of New Jersey (CNJ), following the well-blazed path of many another financially ailing railroad, filed a bankruptcy petition in the District Court for the District of New Jersey. Nine years into the reorganization process—on April 1, 1976—CNJ's rail assets were conveyed to Conrail. And over three years later—on September 14, 1979—CNJ emerged from reorganization as a non-railroad enterprise called Central Jersey Industries (CJI). The launching of CJI followed by one day the entry by the district court of Order 965 denominated an "Order in Aid of Consummation of Amended Plaintiff's Reorganization of the Central Railroad of New Jersey." Paragraph 22 of Order 965 reads, in pertinent part:

> All persons ... are hereby permanently restrained and enjoined from instituting, prosecuting or pursuing ... any suits or proceedings ... against the Reorganization Company or its successors or assigns or against any of the assets or property of the Reorganized Company or its successors or assigns, directly or indirectly, on account of or based upon any right, claim or interest of any kind or nature whatsoever which any person ... may have in, to, or against the Debtor....

Some years after the consummation of the CNJ reorganization, numerous asbestos-related FELA suits were brought against CNJ and CJI in federal and state courts. These suits sought compensation for sickness allegedly caused by asbestos exposure during the course of employment before the CNJ ceased operations. Concurrently, similar suits were brought by former employees of the bankrupt Reading Railroad, which, after turning its rail assets over to Conrail in 1976, had in 1980 emerged from reorganization proceedings in the District Court for the Eastern District of Pennsylvania as a non-railroad. The defendants in these various suits contended that suits arising out of the operations of the two reorganized railroads were barred by Section 77(f) of the then-governing Bankruptcy Act, former 11 U.S.C. § 205(f), which specified, in relevant part, that:

> The property dealt with by the plan, when transferred and conveyed to the debtor or to the other corporation or corporations provided for by the plan, or when retained by the debtor pursuant to the plan, shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities ...

The District Court for New Jersey agreed with defendants that the plaintiffs' suits were "claims" that had been "discharged" and, in reliance on the protective authority spelled out in Order 965, enjoined the prosecution of the FELA suits against CNJ and CJI. The District Court for the Eastern District of Pennsylvania reached the same

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

result with respect to the suits against the Reading.

The enjoined plaintiffs—together with Conrail, which had intervened to oppose the CNJ–CJI–Reading position—appealed the determinations of the two district courts. In *Schweitzer v. Consolidated Rail Corp. (Conrail)*, 758 F.2d 936 (3d Cir.), *cert. denied sub nom Reading Co. v. Schweitzer*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), this court, through Judge Seitz, reversed.

This court began its analysis in *Schweitzer* by setting forth the relevant language of former Section 77(f), and then observed (*id.* at 941):

> The quoted statutory language clearly provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company resulting from a section 77 reorganization. It is equally clear that plaintiffs' rights only could have been affected by the discharge of all "claims" against their employer if they had "claims" within the meaning of section 77 prior to the consummation date of their employer's reorganization.

Next, this court determined that whether the FELA causes of action at issue in *Schweitzer* were dischargeable "claims" within the meaning of former Section 77(f) depended on whether, as a matter of FELA law, those causes of action "existed" as of the date of the consummation of the reorganization. *Ibid.* Building on the Supreme Court decision in *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (silicosis compensable under FELA; three-year statute of limitation starts running as of date " 'effects of the deleterious substance manifest themselves,' " 337 U.S. at 170, 69 S.Ct. at 1025) and also on general principles of tort law as explicated by Deans Prosser and Keeton (758 F.2d at 941–42), this court then held "that, as a matter of federal law, F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury." *Id.* at 942.

In explaining why the contentions of the defunct railroads and their successors-in-

interest were unpersuasive, this court observed (*ibid.*):

> It is true that the possible existence of subclinical asbestos-related injury prior to manifestation may be of interest to a histologist. *See Insurance Company of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1218 (6th Cir. 1980), *clarified* 657 F.2d 814 (6th Cir. 1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Likewise, the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by "bodily injury." *See id.* We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.
>
> Moreover, we are persuaded that a contrary rule would be undesirable as applied in the asbestos-related tort context. If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered.

### The Present Litigation

The present litigation commenced as an application filed in the District Court for the District of New Jersey in December of 1990. The application, submitted by Wilmat Holdings, Inc. (Wilmat) as successor-in-interest to CJI, invoked former Section 77 and Order 965, and sought the issuance of a decree enjoining the continued prosecution, "against Central Jersey Industries, Inc. or any of its successors in interest," of three lawsuits. All three were suits aris-

ing under FELA. In one of them—*Benedetto v. Consolidated Rail Corp. et al.*, Docket No. W–037345–88, pending in the New Jersey Superior Court for Hudson County—the plaintiff had alleged that he had contracted leukemia as a result of exposure to certain toxic substances while working for the railroad. In the two other suits—*Anglemeyer, et al. v. Consolidated Rail Corp.*, Civ. No. 89–7056, and *Delay, et al. v. Consolidated Rail Corp.*, Civ. No. 89–7058, both pending in the District Court for the Eastern District of Pennsylvania—thirty-three plaintiffs had alleged loss of hearing traceable to their employment on the railroad.

In asking that the pending FELA cases be halted, Wilmat asserted that Mr. Benedetto's leukemia was diagnosed in 1965, fourteen years before the September 13, 1979 consummation of the CNJ reorganization, and, similarly, that all, or most, of the hearing-loss plaintiffs had known of their hearing difficulties before September 13, 1979. Accordingly, so Wilmat argued, the ailments of these plaintiffs were, within the intendment of *Schweitzer*, "manifest" before Order 965 was filed, and hence any claims predicated on those ailments were barred.

Judge Fisher, in the District Court for the District of New Jersey, denied the requested injunction. Judge Fisher concluded that Judge Waldman, in *Wyne v. CSX Trans. Co.*, Civ. Action No. 88–9061 (E.D.Pa., July 31, 1989), 1989 WL 89085, at 3, had correctly stated the law: "[B]efore a tort claimant's injuries may be deemed 'manifest' and thus constitute a claim under *Schweitzer* the claimant must know or have reason to know of his condition and the cause thereof." Judge Fisher determined that, on the record before him, it could not be determined as a matter of law that, at some time prior to September 13, 1979, Mr. Benedetto or any of the hearing-loss plaintiffs had "know[n] or [had] reason

to know of his condition and the cause thereof." Judge Fisher intimated that, instead of pursuing equitable relief in his court, Wilmat would do better to develop a fuller evidentiary record as to each plaintiff with a view to moving for summary judgment in the courts in which the FELA actions were pending.[1]

Wilmat has appealed to this court from the district court's denial of injunctive relief.[2]

### Discussion

Determining the date on which a non-traumatic injury becomes an enforceable claim can be a matter of some complexity. Thus, when the Supreme Court, in 1949, determined that silicosis—an occupational disease—was an "injury" compensable under FELA, the Court also was required to address the defendant's argument that the plaintiff, a fireman on the Missouri Pacific for some thirty years, "having been exposed to silica dust since approximately 1910, must unwittingly have contracted silicosis long before 1938, and hence that his 'cause of action' must be deemed to have 'accrued' longer than three years before the institution of this action [in 1941]." *Urie v. Thompson*, 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949). The Court in *Urie*, speaking through Justice Rutledge, rejected the defendant's argument (*id.* at 169–70, 69 S.Ct. at 1024–25):

If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis prior to November 25, 1938, it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a

---

1. We are advised that, subsequent to Judge Fisher's ruling, the claims of the four *Delay* plaintiffs have been dismissed with prejudice. *Brief for Appellees Richard C. Anglemeyer, et al.*, p. 3 n. 4.

2. Conrail, a defendant and cross-claimant in the FELA suits Wilmat seeks to halt, appeared in the district court in opposition to Wilmat's prayer for injunctive relief; Conrail also filed a brief on appeal and participated in the argument.

disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability.

Nor can we accept the theory that each intake of dusty breath is a fresh "cause of action." In the present case, for example, application of such a rule would, arguably, limit petitioner's damages to that aggravation of his progressive injury traceable to the last eighteen months of his employment. Moreover petitioner would have been wholly barred from suit had he left the railroad, or merely been transferred to work involving no exposure to silica dust, more than three years before discovering the disease with which he was afflicted.

We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights. The record before us is clear that Urie became too ill to work in May of 1940 and that diagnosis of his condition was accomplished in the following weeks. There is no suggestion that Urie should have known he had silicosis at any earlier date. "It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves...." *Associated Indemnity Corp. v. Industrial Accident Commission*, 124 Cal. App. 378, 381, 12 P.2d 1075.

■ Thus, actual awareness, or notice, that one has an occupational disease is a necessary condition for commencing the running of the limitation period. But it may not be a sufficient condition. This court held in *Kichline v. Consolidated Rail Corp.*, 800 F.2d 356, 358 (3d Cir.1986):

> Under *Urie's* rationale, when an occupational illness is the basis for the claim under FELA, the statute of limitations begins to run when the employee becomes aware of his disease and its cause.

Judge Waldman in *Wyne* and Judge Fisher in the present case looked to *Urie* and *Kichline* for guidance on when, within the intendment of *Schweitzer*, an FELA claim is "manifest." As Judge Fisher put it, "the claim is not manifest until the party discovers his injury *and the cause thereof* ...." (emphasis in original).[3]

■ Appellant Wilmat argues that it is incorrect to read into *Schweitzer's* use of the term "manifestation" ("F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury" 758 F.2d at 941) the duality of what is to be discovered—"injury and *the cause thereof*"— called for by Judge Fisher. It is true that neither this court's opinion in *Schweitzer*, nor this court's subsequent opinion in *Zulkowski v. Consolidated Rail Corp.*, 852 F.2d 73 (3d Cir.), *cert. denied sub nom., Triangle Ind., Inc. v. Zulkowski*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988) (CJI, as successor to CNJ, not relieved of FELA liability by virtue of transfer of CNJ's rail assets to Conrail), unpacked the word "manifestation" to expose both the ingredients whose discovery spells accrual of the FELA cause of action. But no issue presented in *Schweitzer*, or in *Zulkowski*, required this court to explore the content of "manifestation" in that detail. What is significant is that in *Kichline*—decided between *Schweitzer* and *Zulkowski*—this court was called on to specify the moment of accrual of an FELA claim when the claimant actually is aware of his injury. *Kichline* expressly determined that moment to be "when the employee becomes aware of his disease and its cause." 800

---

**3.** Judge Waldman stated in *Wyne:* "Under the F.E.L.A., a plaintiff's claim does not accrue until the plaintiff knows, or should have known of his condition and its cause." *Wyne v. CSX Trans. Co., supra,* 1989 WL 89085, at 2.

F.2d at 358. That determination remains controlling authority in this Circuit as to the accrual of causes of action arising under FELA.[4]

Wilmat also argues that, for the purpose of determining the dischargeability of claims pursuant to CNJ's consummated reorganization, concepts of FELA claim accrual addressed to the running of the statute of limitations are not pertinent. According to Wilmat, plaintiffs had claims cognizable in the CNJ reorganization at least as soon as they knew they were injured without regard to whether they knew the cause of such injury. We recognize that the bifurcation contended for by Wilmat is a conceptual possibility. Indeed this court, in *Schweitzer*, did, *arguendo*, "assume, without deciding, that under certain circumstances a cause of action may withstand a motion to dismiss for failure to state a claim though the action has not 'accrued' within the meaning of the relevant statute of limitations and, thus, a cause of action may 'exist' before it has 'accrued.'" 758 F.2d at 942. Nonetheless, the court in *Schweitzer* went on to decide the case under FELA accrual principles. The argument that a railroad worker who has an occupational disease that has not yet accrued for FELA purposes has a contingent interest in a debtor railroad's estate was rejected by the *Schweitzer* court. "In our view, before one can have an 'interest' which is cognizable as a contingent claim under Section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow.... There is no legal relationship ... between a tortfeasor and a tort victim until a tort actually has occurred. The tortfeasor-victim legal relationship arises simultaneously with the cause of action in tort. Since we

have said that there is no tort under FELA until injury manifests itself, it follows that there was no legal relationship between plaintiffs and defendants relevant to plaintiff's future causes of action in tort from which an 'interest' could flow." 758 F.2d at 943.

In sum, we are of the view that, under the authority of *Schweitzer* and *Kichline*, the appropriate legal rule is that a claim is not manifest until the claimant discovers, or a reasonable person would have discovered, his injury and knows, or has reason to know, the cause thereof. Moreover, we think the rule is an appropriate accommodation of the federal interests at play in FELA and in bankruptcy:

> The date of legal injury is not the point at which a "creeping disease" crosses the invisible line between potential and actual harm but rather the moment at which the harm is sufficient to put a claimant on notice that his or her rights have been invaded. "Since plaintiff has no claim until the cause of action has arisen, he must be conscious or aware, as would a reasonable person under similar circumstances, of both the tort and damage before he can sue, consequently prescription does not begin to run against [the action] until he has knowledge of both ... indispensable elements of his claim." If a court were to discharge a claim before the elements necessary to its enforcement became apparent, then the claim would never exist at all.

State laws regarding accrual of actions for purposes of statutes of limitation are relevant both to the definition of claims cognizable in bankruptcy and to the proper balance between a victim's right to compensation and a tortfeasor's claim to repose.[5]

---

**4.** The First, Fourth and Fifth Circuits have addressed the same issue with respect to the accrual of FELA claims and reached the same conclusion. *See Albert v. Maine Cent. R. Co.*, 905 F.2d 541, 543–44 (1st Cir.1990) and cases cited therein. As to cases arising under the Federal Tort Claims Act, *see United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), and *Stoleson v. United States*, 629 F.2d 1265 (7th Cir.1980). And see, with respect to the accrual of tort claims arising under state law, the dis-

cussion in *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123, 471 A.2d 493, 500 (1984), recognized by this court as controlling Pennsylvania authority in *Cowgill v. Raymark Industries, Inc.*, 780 F.2d 324, 330 (3d Cir.1985), and *Urland v. Merrell–Dow Pharmaceuticals*, 822 F.2d 1268, 1271 (3d Cir.1987); *see also Wilson v. Johns Manville Sales Corp.*, 684 F.2d 111 (D.C.Cir.1981).

**5.** Gregory A. Bibler, *The Status of Unaccrued Tort Claims in Chapter 11 Bankruptcy Proceed-*

## CONCLUSION

Accordingly, we will affirm the judgment of the district court.

*ings,* 61 Amer. Bankr.L.J. 145, 166–67 (1987) (footnotes omitted). It is to be noted that a construction of former Section 77 permitting the discharge of claims of which tort victims had no effective awareness would raise serious constitutional questions. *Id.* at 168–69.