# UNITED STATES *v.* KUBRICK

No. 78–1014.  Argued October 3, 1979—Decided November 28, 1979

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 125.

*Elinor Hadley Stillman* argued the cause for the United States. With her on the brief were *Solicitor General McCree, Assistant Attorney General Babcock, Deputy Solicitor General Easterbrook,* and *William Kanter.*

*Benjamin Kuby* argued the cause for respondent. With him on the brief were *Paul N. Minkoff* and *Joan Saltzman.*

Mr. Justice White delivered the opinion of the Court.

Under the Federal Tort Claims Act (Act),[1] 28 U. S. C. § 2401 (b), a tort claim against the United States is barred unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues." The issue in this case is whether the claim "accrues" within the meaning of the Act when the plaintiff knows both the existence and the cause of his injury or at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice.

I

Respondent Kubrick, a veteran, was admitted to the Veterans' Administration (VA) hospital in Wilkes-Barre, Pa., in April 1968, for treatment of an infection of the right femur. Following surgery, the infected area was irrigated with neomycin, an antibiotic, until the infection cleared. Approximately six weeks after discharge, Kubrick noticed

---

[1] Title 28 U. S. C. § 2674 provides in part:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

Title 28 U. S. C. § 1346 (b) provides that the district courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Title 28 U. S. C. § 2401 (b), the limitations provision applicable to tort claims against the United States, provides:

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."

a ringing sensation in his ears and some loss of hearing. An ear specialist in Scranton, Pa., Dr. Soma, diagnosed the condition as bilateral nerve deafness. His diagnosis was confirmed by other specialists. One of them, Dr. Sataloff, secured Kubrick's VA hospital records and in January 1969, informed Kubrick that it was highly possible that the hearing loss was the result of the neomycin treatment administered at the hospital. Kubrick, who was already receiving disability benefits for a service-connected back injury, filed an application for an increase in benefits pursuant to 38 U. S. C. § 351,[2] alleging that the neomycin treatment had caused his deafness. The VA denied the claim in September 1969, and on resubmission again denied the claim, on the grounds that no causal relationship existed between the neomycin treatment and the hearing loss and that there was no evidence of "carelessness, accident, negligence, lack of proper skill, error in judgment or other fault on the part of the Government."

In the course of pursuing his administrative appeal, Kubrick was informed by the VA that Dr. Soma had suggested a connection between Kubrick's loss of hearing and his prior occupation as a machinist. When questioned by Kubrick on June 2, 1971, Dr. Soma not only denied making the statement attributed to him but also told respondent that the neomycin had caused his injury and should not have been administered. On Dr. Sataloff's advice, respondent then consulted an attorney and employed him to help with his appeal. In rendering its decision in August 1972, the VA Board of

---

[2] Title 38 U. S. C. § 351 provides that a veteran who suffers "an injury, or an aggravation of an injury, as the result of hospitalization, medical or surgical treatment" administered by the VA shall be awarded disability benefits "in the same manner as if such disability . . . were service-connected." The regulations require the applicant for benefits to show that "the disability proximately resulted through. carelessness, accident, negligence, lack of proper skill, error in judgement, or similar instances of indicated fault on the part of the Veterans Administration." 38 CFR § 3.358 (c) (3) (1978).

Appeals recognized that Kubrick's hearing loss "may have been caused by the neomycin irrigation" but rejected the appeal on the ground that the treatment was in accordance with acceptable medical practices and procedures and that the Government was therefore faultless.[3]

Kubrick then filed suit under the Act, alleging that he had been injured by negligent treatment in the VA hospital.[4] After trial, the District Court rendered judgment for Kubrick, rejecting, among other defenses, the assertion by the United States that Kubrick's claim was barred by the 2-year statute of limitations because the claim had accrued in January 1969, when he learned from Dr. Sataloff that his hearing loss had probably resulted from the neomycin. The District Court conceded that the lower federal courts had held with considerable uniformity that a claim accrues within the meaning of the Act when "the claimant has discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice," 435 F. Supp. 166, 180 (ED Pa. 1977), and that notice of the injury and its cause normally were sufficient to trigger the limitations period.

---

[3] In 1975, upon reconsideration of its decision, the VA Board of Appeals not only found, as it had before, that Kubrick's hearing loss may have been caused by neomycin irrigation but also concluded that there was fault on the part of the VA in administering that drug by irrigation. In the present litigation, the Government contested the allegation of malpractice despite the administrative finding of fault.

[4] Title 28 U. S. C. § 2675 (a) in pertinent part provides:

"An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal Agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."

Kubrick did not file an administrative claim until after he filed his action in the District Court. This possible objection to his suit the District Court found moot when the VA denied the administrative claim on April 13, 1973. The United States did not pursue the issue on appeal.

*Id.,* at 184. As the District Court read the authorities, however, a plaintiff could avoid the usual rule by showing that he had exercised reasonable diligence and had no "reasonable suspicion" that there was negligence in his treatment. *Id.,* at 185. "[W]e do not believe it reasonable to start the statute running until the plaintiff had reason at least to suspect that a legal duty to him had been breached." *Ibid.* Here, the District Court found, Kubrick had no reason to suspect negligence until his conversation with Dr. Soma in June 1971, less than two years prior to presentation of his tort claim.

The District Court went on to hold, based on the expert testimony before it, that a reasonably competent orthopedic surgeon in the Wilkes-Barre community, which the VA doctor held himself out to be, should have known that irrigating Kubrick's wound with neomycin would cause deafness. It was therefore negligent to use that drug in that manner. Damages were determined and awarded.

Except for remanding to resolve a setoff claimed by the United States,[5] the Court of Appeals for the Third Circuit affirmed. 581 F. 2d 1092 (1978). It ruled that even though a plaintiff is aware of his injury and of the defendant's responsibility for it, the statute of limitations does not run where the plaintiff shows that "in the exercise of due diligence he did not know, nor should he have known, facts which would have alerted a reasonable person to the possibility that the treatment was improper." *Id.,* at 1097. We granted certiorari to resolve this important question of the adminis-

---

[5] The VA Board of Appeals' reconsideration of Kubrick's case in 1975 entitled him to an increase in his disability rating as a result of the use of neomycin. By the time of the Court of Appeals' decision, respondent had received over $50,000 in augmented disability benefits. Under 38 U. S. C. § 351, the benefits payments must be set off against the damages awarded in tort; and the increment in future monthly benefits is not paid until the aggregate amount of the benefits withheld equals the damages awarded.

tration of the statute, 440 U. S. 906 (1979), and we now reverse.

## II

Statutes of limitations, which "are found and approved in all systems of enlightened jurisprudence," *Wood* v. *Carpenter,* 101 U. S. 135, 139 (1879), represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Railroad Telegraphers* v. *Railway Express Agency,* 321 U. S. 342, 349 (1944). These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise. *United States* v. *Marion,* 404 U. S. 307, 322, n. 14 (1971); *Burnett* v. *New York Central R. Co.,* 380 U. S. 424, 428 (1965); *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304, 314 (1945); *Missouri, K. & T. R. Co.* v. *Harriman,* 227 U. S. 657, 672 (1913); *Bell* v. *Morrison,* 1 Pet. 351, 360 (1828).

Section 2401 (b), the limitations provision involved here, is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe it so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims. *Campbell* v. *Haverhill,* 155 U. S. 610, 617 (1895); *Bell* v. *Morrison, supra,* at 360. We should regard the plea of limitations as a "meritorious defense, in itself serving a public interest." *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 136 (1938).

We should also have in mind that the Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we

should not take it upon ourselves to extend the waiver beyond that which Congress intended. See *Soriano* v. *United States,* 352 U. S. 270, 276 (1957); cf. *Indian Towing Co.* v. *United States,* 350 U. S. 61, 68–69 (1955). Neither, however, should we assume the authority to narrow the waiver that Congress intended. *Indian Towing Co.* v. *United States, supra.*

It is in the light of these considerations that we review the judgment of the Court of Appeals.

## III

It is undisputed in this case that in January 1969 Kubrick was aware of his injury and its probable cause. Despite this factual predicate for a claim against the VA at that time, the Court of Appeals held that Kubrick's claim had not yet accrued and did not accrue until he knew or could reasonably be expected to know that in the eyes of the law, the neomycin treatment constituted medical malpractice. The Court of Appeals thought that in "most" cases knowledge of the causal connection between treatment and injury, without more, will or should alert a reasonable person that there has been an actionable wrong. 581 F. 2d, at 1096. But it is apparent, particularly in light of the facts in this record, that the Court of Appeals' rule would reach any case where an untutored plaintiff, without benefit of medical or legal advice and because of the "technical complexity" of the case, *id.,* at 1097, would not himself suspect that his doctors had negligently treated him. As we understand the Court of Appeals, the plaintiff in such cases need not initiate a prompt inquiry and would be free to sue at any time within two years from the time he receives or perhaps forms for himself a reasonable opinion that he has been wronged. In this case, for example, Kubrick would have been free to sue if Dr. Soma had not told him until 1975, or even 1980, instead of 1971, that the neomycin treatment had been a negligent act.

There is nothing in the language or the legislative history of the Act that provides a substantial basis for the Court of Appeals' construction of the accrual language of § 2401 (b).[6] Nor did the prevailing case law at the time the Act was passed lend support for the notion that tort claims in general or mal-

---

[6] Respondent concedes as much with respect to the legislative history. The Act was enacted as part of the Legislative Reorganization Act of 1946. 60 Stat. 842. The Senate Report on the bill, S. Rep. No. 1400, 79th Cong., 2d Sess., 33 (1946), merely states that the limitations period is one year but does not mention when a claim accrues. In 1949, the limitations period was extended to two years, Ch. 92, 63 Stat. 62, but the issue of accrual was not further addressed. H. R. Rep. No. 276, 81st Cong., 1st Sess., 1 (1949), notes that the limitations period would enlarge the period for filing to two years from "the date of accrual" but does not explain how to determine the date of accrual. Indeed, to the extent that the Report touches the issue at all, the Report seems almost to indicate that the time of accrual is the time of injury. Thus, the Report states as the reason for the amendment, in addition to bringing the Act more in line with limitations periods for state tort actions and other federal statutes:

"The 1-year existing period is unfair to some claimants who suffered injuries which did not fully develop until after the expiration of the period for making claim. Moreover, the wide area of operations of the Federal agencies, particularly the armed-service agencies, would increase the possibility that notice of the wrongful death of a deceased to his next of kin would be so long delayed in going through channels of communication that the notice would arrive at a time when the running of the statute had already barred the institution of a claim or suit." *Id.*, at 3–4.

The Act was further amended in 1966, 80 Stat. 307, to require that every claim under the Act be presented in writing to the appropriate agency as a prerequisite to suit. The Act originally required presentation to the agency only if the claim was for $1,000 or less, 60 Stat. 845. An amendment in 1959 raised the amount to $2,500, Pub. L. 86–238, 73 Stat. 472. Prior to 1966, the limitations period was keyed to the filing of suit; the 1966 amendment made the time of filing the administrative claim the critical date for limitations purposes. But although the Reports indicate these changes with precision, they do not further explicate when a tort claim "accrues" within the meaning of 28 U. S. C. § 2401 (b). S. Rep. No. 1327, 89th Cong., 2d Sess., 1, 5 (1966); H. R. Rep. No. 1532, 89th Cong., 2d Sess., 3, 8 (1966).

practice claims in particular do not accrue until a plaintiff learns that his injury was negligently inflicted. Indeed, the Court of Appeals recognized that the general rule under the Act has been that a tort claim accrues at the time of the plaintiff's injury, although it thought that in medical malpractice cases the rule had come to be that the 2-year period did not begin to run until the plaintiff has discovered both his injury and its cause.[7] But even so—and the United States was prepared

---

[7] In *Urie* v. *Thompson,* 337 U. S. 163 (1949), the Court held that a claim under the Federal Employers' Liability Act did not accrue until the plaintiff's injury manifested itself. In that case, plaintiff Urie contracted silicosis from his work as a fireman on a steam locomotive. His condition was diagnosed only in the weeks after he became too ill to work. The Court was reluctant to charge Urie with the "unknown and inherently unknowable" and held that because of his "blameless ignorance" of the fact of his injury, his claim did not accrue under the Federal Employers' Liability Act until his disease manifested itself. 337 U. S., at 169–170. *Quinton* v. *United States,* 304 F. 2d 234 (CA5 1962), applied the *Urie* approach to medical malpractice claims under the Federal Torts Claims Act. Other Circuits have followed suit. *Hungerford* v. *United States,* 307 F. 2d 99 (CA9 1962); *Toal* v. *United States,* 438 F. 2d 222 (CA2 1971); *Tyminski* v. *United States,* 481 F. 2d 257 (CA3 1973); *Portis* v. *United States,* 483 F. 2d 670 (CA4 1973); *Reilly* v. *United States,* 513 F. 2d 147 (CA8 1975); *Casias* v. *United States,* 532 F. 2d 1339 (CA10 1976).

Restatement (Second) of Torts § 899, Comment *e,* pp. 444–445 (1979), reflects these developments:

"One group of cases in which there has been extensive departure from the earlier rule that the statute of limitations runs although the plaintiff has no knowledge of the injury has involved actions for medical malpractice. Two reasons can be suggested as to why there has been a change in the rule in many jurisdictions in this area. One is the fact that in most instances the statutory period within which the action must be initiated is short—one year, or at most two, being the common time limit. This is for the purpose of protecting physicians against unjustified claims; but since many of the consequences of medical malpractice often do not become known or apparent for a period longer than that of the statute, the injured plaintiff is left without a remedy. The second reason is that the nature of the tort itself and the character of the injury will frequently

to concede as much for present purposes—the latter rule would not save Kubrick's action since he was aware of these essential facts in January 1969. Reasoning, however, that if a claim does not accrue until a plaintiff is aware of his injury and its cause, neither should it accrue until he knows or should suspect that the doctor who caused his injury was legally blameworthy, the Court of Appeals went on to hold that the limitations period was not triggered until Dr. Soma indicated in June 1971 that the neomycin irrigation treatment had been improper.[8]

---

prevent knowledge of what is wrong, so that the plaintiff is forced to rely upon what he is told by the physician or surgeon.

"There are still courts that proceed to apply the rule that the action is barred by the statute even though there has been no knowledge that it could be brought. . . .

"In a wave of recent decisions these various devices have been replaced by decisions meeting the issue directly and holding that the statute must be construed as not intended to start to run until the plaintiff has in fact discovered the fact that he has suffered injury or by the exercise of reasonable diligence should have discovered it. There have also been a number of instances in which a similar rule has been applied to other professional malpractice, such as that of attorneys or accountants and the rule may thus become a general one."

[8] The Court of Appeals relied on three federal cases, all decided within the past five years, that held or indicated in dictum that a malpractice plaintiff under the federal Act must know the legal implications of the facts, as well as the facts themselves, before the limitations period will begin to run. *Exnicious* v. *United States,* 563 F. 2d 418, 420, 424 (CA10 1977); *Bridgford* v. *United States,* 550 F. 2d 978, 981–982 (CA4 1977); *Jordan* v. *United States,* 503 F. 2d 620 (CA6 1974). Since the holding below, another Circuit has endorsed these views. *De Witt* v. *United States,* 593 F. 2d 276 (CA7 1979).

The dissent, like the respondent, relies on *Urie* and *Quinton,* but neither case controls this one. Both dealt with the discovery of the factual predicate for a malpractice claim, but neither addressed the question of plaintiff's awareness of negligence on defendant's part. Contrary to the implications of the dissent, the prevailing rule under the Act has not been to postpone the running of the limitations period in malpractice cases until the plaintiff is aware that he has been legally wronged. Holdings

We disagree. We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

In this case, the trial court found, and the United States did not appeal its finding, that the treating physician at the VA hospital had failed to observe the standard of care governing doctors of his specialty in Wilkes-Barre, Pa., and that reasonably competent doctors in this branch of medicine would have known that Kubrick should not have been treated with neomycin.[9] Crediting this finding, as we must, Kubrick

---

such as the one before us now are departures from the general rule and, as indicated above, are of quite recent vintage.

[9] The trial court found:

"We credit the testimony of plaintiff's experts that the medical literature as of April 1968 contained sufficient and sufficiently widespread information as to the ototoxicity and absorption properties of neomycin to have warned [the treating physician] of the dangerousness and hence the impropriety of his treatment." 435 F. Supp. 166, 177 (ED Pa. 1977) (footnote omitted).

It further concluded:

"Those findings tell us that [the physician's] lack of knowledge, and his concomitant treatment, violated the national standard for specialists because of the generalized knowledge in the national community of orthopedic specialists of the hazards of neomycin and of its potentiality for absorption in circumstances such as those created by [the physician's]

need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action. The difficulty is that it does not appear that Kubrick ever made any inquiry, although meanwhile he had consulted several specialists about his loss of hearing and had been in possession of all the facts about the cause of his injury since January 1969. Furthermore, there is no reason to doubt that Dr. Soma, who in 1971 volunteered his opinion that Kubrick's treatment had been improper, would have had the same opinion had the plaintiff sought his judgment in 1969.

We thus cannot hold that Congress intended that "accrual" of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.[10] If there exists in the community a generally applicable standard of care with respect to the treatment of his ailment, we see no

---

use of neomycin in 1% irrigating solution through a closed hemovac system (at least in such high and lengthy dosage). However, even if a similar locality standard were to be applied, our findings of fact support the conclusion that the information in question was available to or known by the average specialist in Wilkes-Barre to the same or similar extent as the average specialist in Philadelphia. . . .

"Finally, we conclude that what was involved was not mere error in judgment but a lack of skill or knowledge as measured, of course, by the level of medical knowledge in April, 1968." *Id.*, at 188–189.

[10] As the dissent suggests, *post*, at 128, we are thus in partial disagreement with the conclusion of the lower courts that Kubrick exercised all reasonable diligence. Although he diligently ascertained the cause of his injury, he sought no advice within two years thereafter as to whether he had been legally wronged. The dissent would excuse the omission. For statute of limitations purposes, we would not.

reason to suppose that competent advice would not be available to the plaintiff as to whether his treatment conformed to that standard. If advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim. Of course, he may be incompetently advised or the medical community may be divided on the crucial issue of negligence, as the experts proved to be on the trial of this case. But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make. If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury.

The District Court, 435 F. Supp., at 185, and apparently the Court of Appeals, thought its ruling justified because of the "technical complexity," 581 F. 2d, at 1097, of the negligence question in this case. But determining negligence or not is often complicated and hotly disputed, so much so that judge or jury must decide the issue after listening to a barrage of conflicting expert testimony. And if in this complicated malpractice case, the statute is not to run until the plaintiff is led to suspect negligence, it would be difficult indeed not to apply the same accrual rule to medical and health claims arising under other statutes and to a whole range of other negligence cases arising under the Act and other federal statutes, where the legal implications or complicated facts make it unreasonable to expect the injured plaintiff, who does not seek legal or other appropriate advice, to realize that his legal rights may have been invaded.

We also have difficulty ascertaining the precise standard proposed by the District Court and the Court of Appeals. On the one hand, the Court of Appeals seemed to hold that a Torts Claims Act malpractice claim would not accrue until the plaintiff knew or could reasonably be expected to know of the Government's breach of duty. *Ibid.* On the other hand, it seemed to hold that the claim would accrue only when the plaintiff had reason to suspect or was aware of facts that would have alerted a reasonable person to the possibility that a legal duty to him had been breached. *Ibid.* In any event, either of these standards would go far to eliminate the statute of limitations as a defense separate from the denial of breach of duty.

## IV

It goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable. We should give them effect in accordance with what we can ascertain the legislative intent to have been. We doubt that here we have misconceived the intent of Congress when § 2401 (b) was first adopted or when it was amended to extend the limitations period to two years. But if we have, or even if we have not but Congress desires a different result, it may exercise its prerogative to amend the statute so as to effect its legislative will.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Normally a tort claim accrues at the time of the plaintiff's injury. In most cases that event provides adequate notice to the plaintiff of the possibility that his legal rights have been invaded. It is well settled, however, that the normal rule does

not apply to medical malpractice claims under the Federal Tort Claims Act. The reason for this exception is essentially the same as the reason for the general rule itself. The victim of medical malpractice frequently has no reason to believe that his legal rights have been invaded simply because some misfortune has followed medical treatment. Sometimes he may not even be aware of the actual injury until years have passed; at other times, he may recognize the harm but not know its cause; or, as in this case, he may have knowledge of the injury and its cause, but have no reason to suspect that a physician has been guilty of any malpractice. In such cases—until today—the rule that has been applied in the federal courts is that the statute of limitations does not begin to run until after fair notice of the invasion of the plaintiff's legal rights.

Essentially, there are two possible approaches to construction of the word "accrues" in statutes of limitations: (1) a claim might be deemed to "accrue" at the moment of injury without regard to the potentially harsh consequence of barring a meritorious claim before the plaintiff has a reasonable chance to assert his legal rights, or (2) it might "accrue" when a diligent plaintiff has knowledge of facts sufficient to put him on notice of an invasion of his legal rights. The benefits that flow from certainty in the administration of our affairs favor the former approach in most commercial situations.[1] But in medical malpractice cases the harsh consequences of that approach have generally been considered unacceptable.[2] In all events, this Court adopted the latter approach over 30 years ago when it endorsed the principle that "blameless ignorance" should not cause the loss of a valid claim for

---

[1] See *Gates Rubber Co.* v. *USM Corp.,* 508 F. 2d 603, 611 (CA7 1975).

[2] One should note not only the cases cited by the Court in its footnote 7, *ante,* at 120, but also the reference to "a wave of recent decisions" in the quotation from the Restatement (Second) of Torts in that footnote.

medical injuries. Writing for the Court, Mr. Justice Rutledge expressed the point simply:

"We do not think the humane legislative plan [Federal Employers' Liability Act] intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights." *Urie* v. *Thompson,* 337 U. S. 163, 170.

This rule has been consistently applied by the Courts of Appeals in the intervening decades without any suggestion of complaint from Congress.

In my judgment, a fair application of this rule forecloses the Court's attempt to distinguish between a plaintiff's knowledge of the cause of his injury on the one hand and his knowledge of the doctor's failure to meet acceptable medical standards on the other. For in both situations the typical plaintiff will, and normally should, rely on his doctor's explanation of the situation.[3]

The *Urie* rule would not, of course, prevent the statute from commencing to run if the plaintiff's knowledge of an injury, or its cause, would place a reasonably diligent person on notice that a doctor had been guilty of misconduct. But if he neither suspects, nor has any reason to suspect, malpractice, I see no reason to treat his claim differently than if he were not aware of the cause of the harm or, indeed, of the harm itself. In this case the District Court expressly found that "plaintiff's belief that there was no malpractice was reasonable in view of the technical complexity of the question

---

[3] In its discussion of the reasons why most jurisdictions have adopted a special rule for medical malpractice cases, the Restatement (Second) of Torts notes "that the nature of the tort itself and the character of the injury will frequently prevent knowledge of what is wrong, so that the plaintiff is forced to rely upon what he is told by the physician or surgeon." Restatement (Second) of Torts § 899, Comment *e,* p. 444 (1979).

whether his neomycin treatment involved excessive risks, the failure of any of his doctors to suggest prior to June 1971 the possibility of negligence, and the repeated unequivocal assertions by the Veterans Administration that there was no negligence on the part of the government." 435 F. Supp. 166, 174.

The Court is certainly correct in stating that one purpose of the statute of limitations is to require the "reasonably diligent presentation of tort claims against the Government." *Ante*, at 123. A plaintiff who remains ignorant through lack of diligence cannot be characterized as "blameless." But unless the Court is prepared to reverse the Court of Appeals' judgment that the District Court's findings were adequately supported by the evidence, the principle of requiring diligence does not justify the result the Court reaches today. The District Court found that "plaintiff exercised all kinds of reasonable diligence in attempting to establish a medical basis for increased disability benefits." 435 F. Supp., at 185. That diligence produced not only the Government's denials, but, worse, what may have been a fabrication. It was only after the Government told plaintiff that Dr. Soma had suggested that plaintiff's occupation as a machinist had caused his deafness that plaintiff, by confronting Dr. Soma, first became aware that neomycin irrigation may not have been an acceptable medical practice. Plaintiff was unquestionably diligent; moreover, his diligence ultimately bore fruit. There is no basis for assuming, as this Court holds, that plaintiff could have been more diligent and discovered his cause of action sooner.

The issue of diligence in a negligence case should be resolved by the factfinder—not by the Supreme Court of the United States—and its resolution should depend on the evidence in the record, rather than on speculation about what might constitute diligence in various other circumstances.[4]

---

[4] The factual predicate for the Court's speculation is its assumption that if a patient who has been mistreated by one doctor should ask

Since a large number of circuit judges have reached the same conclusion, and since I find nothing in the Court's opinion that lessens my respect for their collective wisdom, I would simply affirm the unanimous holding of the Court of Appeals for the Third Circuit affirming the judgment of the District Court which merely applied well-settled law to the somewhat unusual facts of this case.[5]

---

another if the first "failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff." *Ante*, at 122. I am not at all sure about those odds. See W. Prosser, Law of Torts 164 (4th ed. 1971); Markus, Conspiracy of Silence, 14 Clev.-Mar. L. Rev. 520 (1965); Seidelson, Medical Malpractice Cases and the Reluctant Expert, 16 Cath. U. L. Rev. 158 (1966). But whatever the odds are generally, I would prefer to have the issue of the diligence in exploring the reason for the unfortunate condition of this deaf plaintiff decided on the basis of evidence relevant to his particular injury.

[5] Not only do I dissent from the Court's result, but I also believe the decision to grant certiorari was ill-advised. The Court notes, *ante*, at 125, that Congress may change the rule announced today. I would add that Congress possesses certain options we do not have, such as creating a bifurcated statute, to temper the interest in repose when it threatens to cause an unfair result. See *Gates Rubber Co.* v. *USM Corp.*, 508 F. 2d, at 611–612. But Congress possessed the same options before this decision as well as after it. There was nothing to prevent the Executive from notifying Congress that the omission of any statutory definition of the word "accrues" has created problems that need legislative attention. Reversal of a just judgment is an unnecessarily high price to pay in order to provide Congress with that notice.