[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 98-4015

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
1/29/99
THOMAS K. KAHN
CLERK

D. C. Docket No. 96-2853-CV-FAM

LILLIAN DIAZ, as Personal Representative
of the Estate of Alejandro Diaz, on behalf
of herself and Alexander Diaz, a minor child,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,
JOSE A. GAY, et al.

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 29, 1999)

Before ANDERSON and DUBINA, Circuit Judges, and FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:

Appellant Lillian Diaz filed a wrongful death claim under the Federal Tort Claims Act for

damages allegedly caused by the negligent treatment of her husband, Alejandro Diaz, by the Federal

Bureau of Prisons ("BOP") psychologists and staff, which resulted in his suicide. The district court

granted the government's motion for summary judgement, holding that the claim was barred by the

Act's statute of limitations. The question presented in this appeal is: when does a claim accrue for

a wrongful death action under the Federal Tort Claims Act? The district court held that the claim

accrues at the time of death. For the reasons discussed below, we conclude that a wrongful death

claim accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both the death and its connection with some act of the defendant. Therefore, we VACATE the district court's order and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

A. Facts

Alejandro Diaz was a federal inmate serving a three-year sentence for his participation in a drug running trip. Mr. Diaz pled guilty and cooperated with the government in its case against his co-defendants. He began serving his sentence at the minimum security prison camp at Eglin, Florida. While at Eglin, Diaz developed an obsessive fear that his co-defendants were threatening his life. He escaped from Eglin on February 16, 1994 after serving two years of his sentence. After a few weeks as a fugitive, Diaz decided to turn himself in to the United States Marshals Service on March 9, 1994. On his return to federal custody, Diaz was incarcerated at the BOP's Metropolitan Corrections Center ("MCC") in Miami.

During his admission to MCC, Diaz was screened for medical and psychological problems. He completed a medical history questionnaire in which he reported a fifty pound weight loss during the preceding weeks, recurring depression, anxiety, headaches, insomnia, racing thoughts and other symptoms. He also reported that he had recently thought about suicide. During his time at MCC, Diaz was seen and evaluated by several of the medical and psychology services staff members. Despite the concerns and recommendations of some of these staff members, Diaz was eventually housed alone without a suicide watch. On March 14, 1994, Diaz hung himself with a bed sheet. A short time before he died, a prison guard performing a routine check saw Diaz kneeling by his bed with a sheet covering his hands, head and shoulders. The guard claims that he thought that Diaz was

2

praying, and therefore did not investigate further. During the next round of inspections, guards found Diaz's lifeless body hanging from the upper bed frame.

Later that day, Mrs. Diaz found out about her husband's death and called the prison. Prison records indicate that she called an associate warden, who confirmed Mr. Diaz's death. Mrs. Diaz testified that the official she spoke to did not give her any further information. She was also called shortly thereafter by the prison chaplain, who called to offer his sympathy. Mrs. Diaz testified that she went to the prison in person to get further information either the same day or the next day. According to her testimony, prison officials told her that they were shocked by her husband's suicide and had no warning that he might kill himself. Mrs. Diaz made no further inquiry into her husband's death until October of 1995, when she went to see a lawyer on the advice of a co-worker.

Both the BOP and the Metropolitan Dade Police Department investigated Mr. Diaz's suicide. The police investigation was conducted by Detective Thomas Surman. In the days immediately following Mr. Diaz's death, Detective Surman made repeated attempts to contact Mrs. Diaz and other family members as part of the investigation. He was only able to contact Mr. Diaz's brother, Oreste. He approached Oreste Diaz at the funeral and suggested that they meet at a later date to "share information" about the suicide. He also asked Oreste Diaz to pass the suggestion on to Mrs. Diaz, as he had been unable to contact her. Neither Oreste nor Lillian Diaz meet with Detective Surman after that day. Detective Surman testified that he would have given Mrs. Diaz any information that she wanted orally at any time, but that the written reports would not have been available until they were prepared in final form. In this case, Detective Surman's report was typed up on May 24, 1994.

In October of 1995 Mrs., Diaz contacted a lawyer, who obtained a copy of Detective Surman's finished report. The written report indicated that Mr. Diaz had been examined and evaluated by BOP psychologists. This was the first indication that Mrs. Diaz had that her husband had received any such medical treatment at MCC before his suicide.

3

B. <u>Procedural History</u>

Appellant submitted an administrative claim to the BOP, which was received on April 10, 1996. The BOP rejected the claim as time barred. She then filed this action in the United States District Court for the Southern District of Florida, alleging wrongful death resulting from malpractice and negligence. Following discovery, the government moved for summary judgement on the basis that Mrs. Diaz did not submit her administrative claim within two years of the claim's accrual. The government argued that a wrongful death claim under the FTCA accrues on the date of death, while Mrs. Diaz contended that, following the traditional medical malpractice rule, her claim did not accrue until she both knew of her husband's death and also knew or exercising reasonable diligence should have known the cause of his death, namely the government's treatment of her husband. The district court granted summary judgement in favor of the government. Mrs. Diaz filed notice of appeal on December 17, 1997, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

We review grants of summary judgement <u>de novo</u>, using the same legal standard as the district court. <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1374 (11th Cir. 1996). Summary judgement is appropriate when the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). In making this assessment, we must view the evidence in the light most favorable to the nonmoving party. <u>Welch v. Celotex Corp.</u>, 951 F.2d 1235, 1237 (11th Cir. 1992).

III. DISCUSSION

In order to bring a tort action against the United States, a plaintiff must act within the two-year statute of limitations period established by the FTCA. The applicable provision dictates that "[a] tort against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). The general rule is that a claim under the FTCA accrues at the time of injury. United States v. Kubrick, 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979). In certain situations, such as medical malpractice, the claim may accrue at a later date. The rule for medical malpractice claims is that they accrue when the plaintiff knows of both the injury and its cause. Id., at 22, 100 S.Ct. at 359. The rationale behind the modified rule is to protect plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and the medical malpractice are in the control of the tortfeasor or are otherwise not evident. Id., at 122, 100 S.Ct. at 359; Price v. United States, 775 F.2d 1491, 1493 (11th Cir. 1985). Under this rule, the plaintiff need not know that she has a legally cognizable claim for the claim to accrue, and may not bury her head in the sand once she is put on notice that the government may have caused an injury. She will not automatically lose her claim, however, merely because the circumstances surrounding the injury make its existence or governmental cause not reasonably knowable. "Thus, a medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both her injury and its connection with some act of the defendant." Price, 775 F.2d at 1494.

Of course, Mrs. Diaz's claim is not a standard medical malpractice claim, but is a wrongful death claim that alleges medical malpractice as a cause of her husband's death. Appellant urges us to extend the medical malpractice diligence-discovery accrual rule to also apply to wrongful death

cases, following <u>Drazan v. United States</u>, 762 F.2d 56 (7th Cir. 1985).[1] The government suggests that we follow a strict rule that wrongful death claims accrue on the date of death, following <u>Garrett v. United States</u>, 640 F.2d 24 (6th Cir. 1981). We are persuaded that <u>Drazan</u> presents the better rule.

In <u>Drazan</u>, a widow brought a wrongful death claim under the FTCA based on alleged malpractice at a Veterans Administration hospital that led to her husband's death. Mr. Drazan had been receiving ongoing treatment for tuberculosis. His annual x-rays revealed the possibility of a tumor in one of his lungs, and the radiologist suggested a follow-up exam within a few weeks. The hospital failed to schedule the appointment, and when Mr. Drazan returned for his next annual check-up the tumor had grown large and cancerous, killing him the next month. His wife requested his medical records 11 months later, and only then saw the radiologists report that indicated the potential tumor and suggested a follow-up exam. <u>Drazan</u>, 762 F.2d at 57-58. In deciding to apply the diligence-discovery rule, the Seventh Circuit made clear that in order for the claim to accrue, a plaintiff must have some indication that there may have been a government cause of the injury. There was nothing in the record that would have, before her request for medical records, given Mrs. Drazan any reason to think that the government may have caused her husband's death by failing to reexamine him. <u>Id.</u>, at 58. We agree that, "[w]hen there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause." <u>Id.</u>, at 59. <u>But see</u>, <u>Zeleznik v. United States</u>, 770 F.2d 20, 23 (3rd Cir. 1985) (holding that claim accrues when the injured party learns of the injury and its immediate cause even without possible knowledge of governmental cause).

---

[1] Other Circuits have also applied this accrual rule in wrongful death cases. <u>See, e.g.</u>, <u>In Re Swine Flu Prods. Liab. Litig.</u>, 764 F.2d 637 (9th Cir. 1985) (applying medical malpractice accrual rule in wrongful death action where death resulted from medical malpractice); <u>Kronisch v. United States</u>, 150 F.3d 112 (2nd Cir. 1998) (applying diligence-discovery rule in wrongful death case where plaintiff would reasonably have difficulty discerning the fact or governmental cause of injury).

As previously discussed, one of the reasons for using the diligence-discovery rule in medical malpractice cases is that the facts indicating a governmental cause may be solely in the hands of the governmental tortfeasor or may be otherwise difficult to obtain. This reason is no less valid merely because the patient dies. Furthermore, even in non-malpractice wrongful death cases, the causal link to the government may be obscured. If the link is not obscured, then the plaintiff will have notice of that cause and the rule will not operate to extend the accrual date past the date of injury. The government has not advanced any discernable argument as to why we should follow Garrett, an opinion that merely concludes, without analysis, that a wrongful death claim based on medical malpractice in a federal prison accrues on the date of death. Garrett, 640 F.2d at 26. Instead, we are persuaded by the opinions in the majority of Circuits that have addressed this issue and extend the diligence-discovery accrual rule to wrongful death actions brought under the FTCA. Therefore, such a wrongful death claim accrues when the plaintiff knows, or exercising reasonable diligence should know, both of the decedent's death and its causal connection with the government. In situations, such as Mrs. Diaz's case, where there are allegedly multiple causes of death, we agree with the Seventh Circuit:

> The cause of which a federal tort claimant must have notice for the statute of limitations to begin to run is the cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury. The notice must be not of harm but of iatrogenic [doctor-caused] harm, though, as Kubrick holds, not necessarily of negligent iatrogenic harm.

Drazan, 762 F.2d at 59.

### III. CONCLUSION

7

Having determined that the diligence-discovery rule applies in this case, the disposition of the government's motion for summary judgement depends on whether Mrs. Diaz exercised reasonable diligence after being confronted with the news of her husband's suicide. More specifically, the date of accrual will be either the date that she obtained actual knowledge of the government's medical and psychological treatment of her husband or the date that a person in her situation and exercising reasonable diligence should have known that he was treated. Suicides, regrettably, do take place in prisons. Mere knowledge of such a suicide, without any indication of medical treatment beforehand, is clearly not enough to put a plaintiff on notice that medical malpractice may have occurred. Because the district court granted summary judgement using the incorrect rule of accrual, it did not reach the issue of when Mrs. Diaz should have known that her husband was evaluated and treated by psychological services.[2] We therefore VACATE the district court's order and REMAND for further proceedings consistent with this opinion.

---

[2] In a footnote in its Order Granting Summary Judgement, the district court noted: "Although the Court does not reach this issue, the Defendant has presented persuasive argument that the Plaintiffs [sic] cause of action should accrue on March 25, 1994, the day after Alejandro Diaz committed suicide. Because of the nature of the death and the Corrections Center's customary practice of providing all inmates with medical treatment, the Plaintiff had constructive notice that Alejandro Diaz might have received treatment and, therefore, the Plaintiff should have exercised reasonable diligence at that time to determine whether Alejandro Pena [sic] received mental health treatment prior to his unfortunate death." References to famous baseball players aside (Alejandro Pena was a pitcher for Atlanta, Pittsburgh, Boston and Miami during the time period relevant to this case and was in no way implicated in the litigation), we are unable to find any evidence in the record that would indicate that Mrs. Diaz had notice of any alleged customary practices at MCC, therefore we fail to see how she could be charged, as a matter of law, with constructive knowledge that her husband received psychological treatment based solely on those customary practices and the fact that her husband committed suicide. The appropriate inquiry is into when a reasonably diligent person in Mrs. Diaz's situation would have been put on notice that the government gave her husband psychological treatment shortly before his suicide. While performing this inquiry, the court must keep in mind that Mrs. Diaz is the non-moving party in a motion for summary judgement. As such, reasonable inferences must be drawn in her favor, not against her. In order for the government to prevail on summary judgement the court must find that any person in Mrs. Diaz's position and exercising reasonable diligence would have discovered the government's psychological treatment of her husband within three weeks of his death, which is the period of time beyond the second anniversary of his death that she filed the claim.