[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 3, 2010
JOHN LEY
CLERK

_____

No. 09-13724

_____

D. C. Docket No. 07-01239-CV-T-33-EAJ

SAMUEL MCCULLOUGH,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 3, 2010)

Before DUBINA, Chief Judge, MARTIN and COX, Circuit Judges.

MARTIN, Circuit Judge:

Days before routine scheduled hernia surgery, Samuel McCullough ("Mr.

McCullough") went to a Veterans Affairs hospital complaining about neck pain.

Ten days after the surgery, he was quadriplegic. The district court granted summary judgment for the United States because Mr. McCullough's administrative claim was filed more than two years after Mr. McCullough knew that his paralysis was caused by a spinal abscess. We feel sympathy for Mr. McCullough in light of his misfortune. Nonetheless, the statute of limitations requires us to affirm.

## I.

In 1973, Mr. McCullough suffered gunshot wounds to the abdomen while serving in the military. The residual effects of the wounds and other injuries caused him chronic pain as he got older. Starting in 2001, Mr. McCullough made a number of visits to the James A. Haley Veterans' Hospital ("VA Hospital") in Tampa, Florida for treatment of various hip, back, and neck problems.

In December 2003, Mr. McCullough was diagnosed with a left inguinal hernia. Elective hernia repair surgery at the VA Hospital was scheduled for February 10, 2004.

On the evening of February 7, 2004, Mr. McCullough went to the VA Hospital emergency room complaining of severe neck and upper back pain. After a physical exam, the attending physician diagnosed muscle strain, prescribed pain medication and a muscle relaxant, and discharged Mr. McCullough during the early morning hours of February 8, 2004.

Mr. McCullough returned to the VA Hospital the next day, because the pain in his upper back had gotten worse.  According to Mr. McCullough, the examining physician noted that he had a fever but could find nothing wrong and ordered no diagnostic tests.  Instead, he was given a pain reliever and medication to reduce his fever.

Mr. McCullough arrived at the VA Hospital for his scheduled hernia operation on the morning of February 10, 2004.  Although he advised the nurse about his previous day's visit, the preoperative surgery re-evaluation concluded, "Reassessment shows no change in patient status which would alter the treatment plan."  No apparent complications occurred during the surgery, but Mr. McCullough had a fever while in recovery.  He was sent home with additional pain medication by midafternoon.

The next morning, Mr. McCullough returned to the VA Hospital, complaining of fever, inability to urinate since the surgery, and great pain.  He was instructed on the use of a Foley catheter, prescribed additional medication, and discharged.

On February 12, 2004, Mr. McCullough was taken to the emergency room of St. Joseph's Hospital, still running a fever but now also experiencing paralysis in his limbs.  Later that day, the doctors at St. Joseph's determined that he had an

infection in his upper spine known as an epidural spinal abscess.  The abscess had been caused by a bacterial infection.  Although surgery was immediately performed to drain the abscess, the surgery did not reverse the damage.  On February 20, 2004, Mr. McCullough was diagnosed with quadriplegia and transferred to the VA Hospital for acute spinal cord injury rehabilitation.  Due to various complications—including pneumonia, surgery for a bowel obstruction, a postoperative infection, depression, and pressure sores—he remained in the VA Hospital until the end of June 2004.

At some point, Mr. McCullough consulted with the law firm of Wagner, Vaughan & McLaughlin.  The firm sent a letter to the U.S. Department of Veterans Affairs ("VA") in mid-April 2004, requesting Mr. McCullough's medical records from February 1, 2003 onward.  The VA responded on April 22, 2004, and it later produced additional records in October 2004 and July 2008.

Mr. McCullough eventually retained the law firm of Morgan & Morgan, P.A. to represent him.  On November 21, 2005, and on December 15, 2005, the firm sent Mr. McCullough's medical records to Dr. Daniel L. Abbott ("Dr. Abbott") and Dr. J. Parker Mickle ("Dr. Mickle") respectively.  After an initial telephone consultation, Dr. Mickle reduced his opinion to writing on March 6, 2006.  In Dr. Mickle's opinion, Mr. McCullough had an epidural abscess prior to

4

the February 10, 2004, hernia surgery; if appropriate diagnostic and medical care been provided during either of Mr. McCullough's hospital visits on February 7 or 9, 2004, "more likely than not [the abscess] would have been detected and the resulting neurological injury avoided"; and the hernia operation made Mr. McCullough's situation worse. Dr. Abbott, in a letter dated February 28, 2006, agreed that the VA physicians should have investigated the fever and neck pain prior to doing an elective procedure; that a proper investigation very likely would have found the abscess before Mr. McCullough developed any neurological symptoms; and that the VA Hospital should not have performed the elective hernia surgery.

Mr. McCullough's administrative claim was received by the VA on March 13, 2006. The VA denied the claim because it had not been presented within the two-year period prescribed by 28 U.S.C. § 2401(b). After failing to obtain reconsideration of the denial, Mr. McCullough initiated the present lawsuit. His complaint, which was brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, alleged that the VA was negligent in its diagnosis, care, and treatment of Mr. McCullough in the days before and after the hernia surgery.

In its answer, the government asserted that Mr. McCullough's claim was

5

barred by the FTCA's two-year statute of limitations.  After discovery, both Mr. McCullough and the government moved for summary judgment on the statute of limitations issue.

On May 22, 2009, the district court granted summary judgment for the government.  The district court determined that the statute of limitations began running no later than February 20, 2004.  For the district court, the dispositive fact was that Mr. McCullough knew on this date that his paralysis was caused by an abscess.  The district court concluded, "A reasonably diligent person armed with this knowledge would have sought information as to when the abscess developed or when it should have been detected.  This is especially so when, as here, that person had previously sought treatment on multiple occasions for severe neck pain."  Because the VA did not receive Mr. McCullough's administrative claim until March 13, 2006, the district court held that the claim had been filed too late.  Mr. McCullough timely appealed.

## II.

"We review the district court's grant of summary judgment *de novo*, viewing all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party."  Rine v. Imagitas, Inc., 590 F.3d 1215, 1222 (11th Cir. 2009).  Summary judgment is appropriate when "there is no

genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "'We review *de novo* the district court's interpretation and application of the statute of limitations.'" Baker v. Birmingham Bd. of Educ., 531 F.3d 1336, 1337 (11th Cir. 2008) (quoting Brown v. Ga. Bd. of Pardons & Paroles, 335 F.3d 1259, 1261 n.2 (11th Cir. 2003)).

Under 28 U.S.C. § 2401(b), "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." In United States v. Kubrick, 444 U.S. 111, 100 S. Ct. 352 (1979), the Supreme Court held that a medical malpractice claim accrues "when the plaintiff knows both the existence and the cause of his injury," even if he does not yet know that "the acts inflicting the injury may constitute medical malpractice." Id. at 113, 122, 100 S. Ct. at 353, 359. The plaintiff in Kubrick suffered hearing loss after receiving neomycin, an antibiotic, at a VA hospital. Id. at 113–14, 100 S. Ct. at 355. The Supreme Court held that Mr. Kubrick's claim accrued when he was advised in January 1969 that his hearing loss was probably caused by the neomycin treatment, rather than when he was informed in June 1971 that a reasonably competent doctor would have known not to use neomycin. Id. at 114, 122–23, 100 S. Ct. at 355, 359–60. As the Court explained, once a plaintiff is "in possession of the critical facts that he has been hurt and who

7

has inflicted the injury[,] . . . [t]here are others who can tell him if he has been wronged, and he need only ask." Id. at 122, 100 S. Ct. at 359; see also Price v. United States, 775 F.2d 1491, 1494 (11th Cir. 1985) ("[A] medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both [his] injury and its connection with some act of the defendant.").

There is no dispute in this case that Mr. McCullough knew about the existence of his injury—quadriplegia—on February 20, 2004. The key issue is when he knew or should have known about the cause of that injury. See Waits v. United States, 611 F.2d 550, 552 (5th Cir. 1980) ("It is not enough to trigger the statute of limitations that the claimant is aware of his injury if he is unaware of the act or omission which caused the injury.").[1]

We have previously explained that a claim does not accrue if the cause is "not reasonably knowable." Diaz v. United States, 165 F.3d 1337, 1339 (11th Cir. 1999). However, a plaintiff may not "bury [his] head in the sand once [he] is put on notice that the government may have caused an injury." Id. Thus, the statute of limitations begins to run when "the plaintiff knows that [his] injury is connected to

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

some act of those who treated [him]," even if he does not know "the particular acts that resulted in [his] injury." Price, 775 F.2d at 1493–94.

For cases involving multiple causes, we have adopted the following rule from the Seventh Circuit:

> "The cause of which a federal tort claimant must have notice for the statute of limitations to begin to run is the cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury. The notice must be not of harm but of iatrogenic [doctor-caused] harm . . . ."

Diaz, 165 F.3d at 1340 (quoting Drazan v. United States, 762 F.2d 56, 59 (7th Cir. 1985)) (alteration in original). In other words, "'[w]hen there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause.'" Id. (quoting Drazan, 762 F.2d at 59) (alteration in original).

In this case, the natural cause of Mr. McCullough's injury was the abscess. According to Mr. McCullough, however, there was also a separate doctor-related cause—namely, the fact that the medical personnel at the VA Hospital (1) failed to diagnose the abscess on February 7 or 9, 2004, and (2) allowed the hernia surgery to proceed on February 10, 2004. Because summary judgment was entered against Mr. McCullough in this case, we will assume for purposes of this appeal that the VA Hospital's failure to timely diagnose and treat the abscess did indeed result in

9

his paralysis.  The question then becomes when Mr. McCullough knew or in the exercise of reasonable diligence should have known about the VA Hospital's role in his injury.

We are not persuaded by Mr. McCullough's argument that he could not have known about the doctor-related cause until he had a reasonable opportunity to obtain his medical records.  He did not need his medical records to learn the "critical facts" indicating that he had been hurt and who had inflicted the injury.  Kubrick, 444 U.S. at 122, 100 S. Ct. at 359.  The reason his experts were able to determine that the abscess predated the hernia surgery was because Mr. McCullough experienced severe neck pain, swelling at the base of his neck, and a fever prior to the surgery.  Mr. McCullough knew these critical facts long before he obtained his medical records:  he went to the VA Hospital on February 7 and 9, 2004, complaining of neck pain and swelling, and the doctor there told him that he had a fever.  In addition, the emergency surgery to drain the abscess was in the same location as the neck pain Mr. McCullough had been experiencing just a few days earlier.  The physical and temporal proximity should have alerted him to the possibility that the VA doctors missed something during his prior visits to the VA Hospital.  Once Mr. McCullough learned that his paralysis had been caused by an abscess in the exact location where he had previously complained about severe

pain, "there was no reason for [him] not to seek advice from others as to whether [his] treatment had been negligent." Price, 775 F.2d at 1494.

The facts of this case are thus distinguishable from Waits, 611 F.2d 550. In Waits, the patient knew that he had an infection which resulted in the amputation of his leg. Id. at 553. Unlike Mr. McCullough, however, Mr. Waits did not know or have reason to know that the VA hospital failed to treat the infection. Id. Infections as serious as Mr. Waits's were a common problem at that time, and did not necessarily indicate any negligence by the hospital. Id. It was only after reviewing his medical records that Mr. Waits learned the critical facts indicating malpractice—namely, that the hospital lab failed to produce the test results indicating what kind of infection he had, that the doctors proceeded without the benefit of those test results, and that the doctors prescribed an antibiotic known to be ineffective for his particular kind of infection. Id. Here, in contrast, the critical facts were the existence of Mr. McCullough's neck pain, swelling, and fever. The medical records confirmed that Mr. McCullough presented with pain, swelling, and fever on February 7 and 9; they did not reveal any new facts needed to discover the causal link. See Chasteen v. United States, 334 F. App'x 271, 273–74 (11th Cir. 2009) (holding that the plaintiff's claim accrued before the autopsy report was issued, because "[t]he autopsy in this case did not serve to inform Appellant of the

11

causal connection, but rather confirmed what they already believed").

The other case that Mr. McCullough relies on, Hughes v. United States, 263 F.3d 272 (3d Cir. 2001), does not help him either. Advice from his doctors led Mr. Hughes to believe that his injury (gangrene and subsequent amputations) was a natural, albeit unexpected, allergic reaction to a drug. Id. at 276. Only after being discharged did Mr. Hughes learn the critical fact for his malpractice claim—namely, that the doctors had failed to apply anticoagulants that could have stopped the allergic reaction. Id. The Third Circuit remanded so that the district court could determine when Mr. Hughes learned or should have learned about the doctors' failure to apply the anticoagulants. Id. at 277–78. In contrast, the fully developed record in this case indicates that Mr. McCullough knew the critical facts in mid-February 2004, more than two years before he submitted his administrative claim.

We are not persuaded that Mr. McCullough needed his medical records to rule out other potential causes, such as a mistake committed by St. Joseph's Hospital or a complication arising out of his history of neck and spine problems. Mr. McCullough's first symptoms of paralysis preceded his arrival at St. Joseph's. Even if St. Joseph's committed malpractice in failing to stop the progression of the paralysis, there is no basis for saying that it played a role in *causing* the paralysis.

12

And Mr. McCullough's history of medical problems did not absolve him of his duty to inquire about his new neck pain. The pain that sent him to the VA Hospital on February 7 and 9 was located in a different part of his body than all of his previous pains. In addition, Mr. McCullough's previous pains were always associated with a known cause, such as a gunshot wound or motor vehicle accident. There was no known associated cause for the new pain. These facts were sufficient to put him on notice that the new pain was different and that it might be advisable to consult medical and legal experts. See Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998) ("A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." (citations omitted)).

We recognize that Mr. McCullough exercised commendable diligence in requesting his records only two months after being paralyzed, while undergoing acute spinal injury rehabilitation. Cf. Price, 775 F.2d at 1494 (plaintiff waited three years to request records); Waits, 611 F.2d at 551–52 (approximately eighteen months between amputation and request for medical records); Hughes, 263 F.3d at 274 (nearly two years between discovery of injury and request for records). However, that does not save him from the statute of limitations. Mr. McCullough

13

was armed in mid-February 2004 with the critical facts about the harm done to him, and his claim accrued at that time. Even in cases where a potential plaintiff is incompetently advised that he does not have a viable malpractice claim, the Supreme Court has "discern[ed] no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed." Kubrick, 444 U.S. at 124, 100 S. Ct. at 360. Similarly, we see no sound reason to penalize the United States in this case for the fact that Mr. McCullough's attorneys used up twenty-one of the twenty-four allotted months when they delayed in consulting medical experts.

## III.

Mr. McCullough argues alternatively that the statute of limitations was tolled under the continuous treatment doctrine because he remained in the care of the VA Hospital until June 30, 2004. However, neither the Eleventh Circuit nor the former Fifth Circuit has specifically adopted the continuous treatment doctrine, and we decline to do so here. We express no views about the doctrine's applicability in this circuit. We only note that, even if we were to adopt the doctrine, it would not save Mr. McCullough's claim. The Eighth Circuit's formulation of the continuous treatment doctrine does not apply to the facts of this case, and the policy rationales used in other circuits are not implicated.

14

In the Eighth Circuit, "a plaintiff's cause of action does not accrue until the tortious continuing treatment ends, even if the plaintiff is aware of the facts constituting negligence before that time." Wehrman v. United States, 830 F.2d 1480, 1483 (8th Cir. 1987). However, the Eighth Circuit requires that "the entire course of treatment be negligent," not just some portion of it. McCoy v. United States, 264 F.3d 792, 795 (8th Cir. 2001). Because Mr. McCullough alleges only that the VA Hospital was negligent between February 7 and 11, 2004, and makes no claims about negligent treatment while he was undergoing rehabilitation at the VA Hospital from February 20 through June 30, 2004, the Eighth Circuit's formulation of the continuous treatment doctrine would not toll the accrual of Mr. McCullough's claim.

The requirements are less stringent in the Second, Fourth, Ninth, and D.C. Circuits, where the statute of limitations is tolled if some part of the ongoing treatment is negligent, even if subsequent treatment is non-negligent. See Miller v. United States, 932 F.2d 301, 304 (4th Cir. 1991) ("[T]he statute of limitations does not begin to run on a medical malpractice claim upon a claimant's initial discovery of an injury and its cause so long as the claimant remains under the 'continuous treatment' of a physician whose negligence is alleged to have caused the injury; in such circumstances, the claim only accrues when the 'continuous treatment'

15

ceases."); <u>Ulrich v. Veterans Admin. Hosp.</u>, 853 F.2d 1078, 1080–81 (2d Cir. 1988); <u>Page v. United States</u>, 729 F.2d 818, 823 n.36 (D.C. Cir. 1984). The Ninth Circuit also adheres to this doctrine, except in cases where "the plaintiff knows of the acts constituting the negligence." <u>Outman v. United States</u>, 890 F.2d 1050, 1053 (9th Cir. 1989).

However, the two policy rationales behind the other circuits' somewhat looser formulations are not implicated here. The first rationale is that "it is not reasonable to expect a patient who is in the continuing care of a doctor to discover that the doctor's acts may be the cause of his injuries." <u>Ulrich</u>, 853 F.2d at 1080. Unlike typical patients who might feel inhibited from conducting an investigation or questioning the care given, however, Mr. McCullough already had all the critical facts needed to discover the VA Hospital's misdiagnosis before he returned for spinal injury rehabilitation. The second rationale for the continuous treatment doctrine is that it would be "absurd to expect a patient being treated by a doctor or hospital to interrupt corrective treatment by instituting suit against either while under their continuing care." <u>Id.</u> at 1081. But Mr. McCullough's attorneys requested his medical records—a clear precursor to possible litigation—while he was still in the VA's care, and Mr. McCullough nonetheless remained at the VA Hospital for an additional two months without any interruption in treatment. Given

16

the facts of this case, neither of the policy rationales justify adoption of the continuous treatment doctrine.

## IV.

We find that Mr. McCullough had sufficient information on February 20, 2004, to put him on notice about the doctor-related cause of his injury. The existence of the fever, swelling, and severe neck pain, when combined with the location, timing, and unexplained origin of the neck pain, provided him with the critical facts needed to pursue a potential malpractice claim against the VA. In so holding, we do not mean to minimize the awful harm done to him. However, Congress has determined that two years is a reasonable time for a plaintiff "armed with the facts about the harm done to him . . . [to] protect himself by seeking advice in the medical and legal community." Kubrick, 444 U.S. at 123, 100 S. Ct. at 360. "[W]e are not free to construe [the statute of limitations] so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims." Id. at 117, 100 S. Ct. at 357. For these reasons, the judgment of the district court is **AFFIRMED**.